[Civ. No. 8323. First Appellate District, Division One.—August 29, 1932.]

ALLAN MALLOWAY, a Minor, etc., Respondent, v. JAMES HUGHES et al., Appellants.

James Sykes and Thomas F. McCue for Appellants.

Ford & Johnson for Respondent.

KNIGHT, J.—Plaintiff Allan Malloway, aged four years and ten months, while attempting to cross a street in Monterey, about 10 o'clock on the morning of the 4th of July, 1930, was struck and injured by an automobile owned by the defendants James Hughes and Mabel R. Hughes, and driven by their daughter, the defendant Betty Hughes, aged sixteen years, and through his guardian *ad litem* brought this action to recover damages for the injuries sustained. The action was tried before a jury, which rendered a verdict in favor of the defendants, and judgment was entered accordingly. Subsequently, on motion of plaintiff, the trial court granted a new trial on the grounds of insufficiency of the evidence to justify the verdict, and from such order the defendants appeal.

The accident occurred at the intersection of High and Harriet Streets, which are forty or forty-five feet wide. The former runs in a northerly and southerly direction, and the middle, traveled portion thereof is paved with rock and asphalt. Between the sidewalk and the curb there is a strip planted to grass. Harriet Street is unpaved, and is without curbs or sidewalks in the vicinity of the intersection with High. The grade of neither street is level for any considerable distance from the intersection. The injured boy lived on the southeast corner of the intersection, and the house directly opposite, on the southwest corner, was occupied by a Mrs. Wishart. The automobile which Betty Hughes was driving, a Packard, was proceeding northerly along High Street, and was approaching the intersection when the boy attempted to cross the street. He started from the easterly curb of High Street in front of his home to cross to the westerly side of High Street to the curb in front of the Wishart house, where some other children were playing; and the impact occurred on High Street at or near the produced southerly intersecting curb line of Harriet Street.

Besides Betty Hughes, there were two other witnesses to the accident, Mrs. Perrin and a boy named Turner, twelve years old. Mrs. Perrin was riding in an automobile driven by her husband, traveling southerly on High Street just northerly of its intersection with Harriet; and the Turner boy was standing on the sidewalk on Harriet Street just easterly of the intersection. Betty Hughes testified that she first saw the Malloway boy about a half block ahead (approximately sixty feet), at which time he was walking slowly from his house toward the easterly curb line of High Street, and was about twenty feet in from the curb; that about the same time she observed some children on the opposite side of the street. At that time, so she testified, she was traveling between eighteen and twenty miles an hour; that she sounded the automobile horn, and took her foot off the gas accelerator; that when she sounded the horn the Malloway boy stood still, and she continued on; that when she reached a point about opposite the boy, at which time she was traveling about twelve miles an hour, the boy darted from the curb toward the automobile; that she applied the brakes immediately and swerved the car

sharply to the left, but the boy continued to run slightly ahead of and parallel with the right front end of her automobile; that she felt "a very slight thud" and at the same time looked up High Street and saw an automobile (which proved to be the Perrin car) approaching the intersection in the opposite direction on High Street. Continuing, she testified: "I knew I was either endangering myself or the car coming, and I think I applied the gas possibly, I am not certain, to get out of their way and kept turning into Harriet Street", stating further in this respect, "my natural instinct was, to get out of the way of the oncoming car, because there would be another smashup". At any rate, the evidence shows that her automobile continued on diagonally over the intersection and across the pathway of the Perrin car, and stopped against the curb on the northwest corner of the intersection. In making the turn westerly down Harriet Street the rear end of the automobile swerved or skidded to the right against the curb, splintering some of the spokes in the rear right wheel. The evidence further shows that the boy was struck by the right end of the front bumper and was thrown several feet toward the middle of Harriet Street, where it intersects the produced easterly curb line of High Street, and that the main injuries sustained were a fractured clavicle, a fractured femur, both on the left side, and a linear skull fracture.

The testimony of Mrs. Perrin was substantially the same as that given by Betty Hughes, except that she states that the boy started to run across the street from the curb at the very corner of the intersection, and not several feet south of the corner; and she stated also that she saw some of the children run across the street just before the Malloway boy attempted to cross. In this regard she stated that she first saw the Hughes car when it was about a half block southerly of the intersection, at which time it was traveling between fifteen and twenty miles an hour, and at the same time she observed the children playing in front of the Malloway house on the High Street side and that being conscious of the approaching automobile she watched the children because her own children were approximately the same age. Continuing, she stated that after some of the children had "darted" across the street the Malloway boy, who had a toy gun in his hand, turned very quickly and went back

away from the curb toward his house. "The next thing that happened", she said, as her testimony is given in narrative form in the bill of exceptions, "was that he apparently changed his mind and dashed out to the curb, and at that time Betty's car was there right in front of the house when Allan Malloway darted out. The Hughes car I would say at that time was about half a car length toward the corner from the center of the house. Then just as quick as a flash the child turned around from the front of the house and went out and stepped off the curb, and Miss Hughes was driving close to the curb and he stepped right in front of the car, and Miss Hughes was very quick with the wheel, and she pulled the car around to the left and the child apparently followed the front of the car around. She was driving along this way and the child continued to follow the front of the car this way, and then he was hit—he was hit on this part of the street, and Miss Hughes turned to the left constantly and the child constantly being to the right of the car—to the right of the front bumper. I saw the child hit. I could not say that I saw the child actually run into the car but that was what happened. The child ran into the Hughes car. He ran into the right of the front bumper at that time. I would say that Betty Hughes' car was going about four or five miles an hour." And again on cross-examination she stated: "The first impression I got was he was going across with the children. Instead of that he ran back over toward the house, as quick as a flash he ran from the house to the street. He was darting all the time. He was in movement. Children run fast. He was traveling as fast as the automobile. I would say he was. The automobile was going slowly. Yes, he ran out in the street ahead of the automobile, right in front of it. In the direction the automobile was going. She turned her car. I stated he was running as fast as the automobile. He was naturally ahead of the automobile. He was, he was right—I would say that he stepped in front of the automobile and she pulled the car away. He was running when he came off the curb and he was ahead of the automobile. He hesitated for just an instant after he got off the curbing. . . . He was even with the front bumper, and I think the children were over here and I think he thought he could go around the front of the

car. He was trying to beat it and get around it and get to the other side of the street. He ran out past the middle of Harriet Street, anyway, to get in front of this automobile. The automobile was turning to the left constantly. It was not going faster than the boy. It was creeping . . . and kept going slower and slower.''

The following is the substance of the testimony given by the Turner boy: ''I saw Allan Malloway before he was hit by the automobile. He was then right behind the chalkrock wall. Then he went across the street to Wishart's. He started from the corner of the curb near the corner where the two streets join. At that time I was standing in the street just going by Harriet Street. Allan was walking slow in a straight line across the street. He didn't get quite to the middle of the street. . . . I was watching him all the time, that he was going over across the street. I did not hear an automobile horn at the time. I heard the brakes before he was hit. I then saw the automobile. I have ridden in an automobile and watched the speedometer. I was in an automobile this morning when it was driven fifteen miles, twenty miles, thirty and forty miles an hour. I think the Packard automobile at the time it struck Allan Malloway was going about thirty-five miles. The car struck him on the side. That is on his side. The side of the bumper hit him. He was rolled over on the pavement.'' Afterward, as a witness for defendants, he admitted having said immediately after the collision that ''Betty was not going fast . . . not going very fast'', meaning, so he said, that about fifty miles an hour would be fast.

A traffic officer arrived at the scene of the accident about forty minutes after it happened, and he observed the position of the Hughes car, with the right rear wheel against the curb and one or two or three pieces of split or broken spokes. He also saw skid marks leading up to the Hughes car. His testimony in this regard as it is set forth in narrative form in the record was as follows: ''The first skid marks—this is the line of the curb extending across High Street, and there were two distinct skid marks starting about twenty-two feet from the line of this Harriet Street curb, back up and about twelve feet up from the High Street curb—two distinct skid marks. These skid marks extended down north on High Street, and at a point here, about even with the Harriet

Street curb line, the left hand skid mark left just a few jump marks and just at the point where the car was sitting, was a small heavy skid mark for a short distance. The right hand skid mark was heavy all the way, over seventy-two feet. This skid mark was heavy clear over to this point. That was a distance of about seventy-two feet. It was measured by me. This skid mark here was twenty-two feet at this point and then the others were sort of jump marks—they didn't keep solid all the way through, until it got to the curb. Then there was twelve or fifteen feet of heavy skid marks, from the left hand wheel." He further testified that a Packard automobile (similar to the Hughes car) having two-wheel brakes, in good condition, running at fifteen miles an hour, could be stopped "in about thirty to thirty-five feet", and that running at twenty miles an hour it would require forty to forty-five feet to bring it to a stop.

Mrs. Malloway and Mrs. Wishart were in their respective homes at the time the accident happened and did not see it, but they saw the boy immediately before it happened. They were looking through the windows of their houses and saw the boy as he stepped from the curb and was about to cross the street. They stated that at that time they heard no automobile approaching. They turned and walked away from the windows, and just a few seconds afterward they heard the screech of brakes and Mrs. Wishart heard the automobile strike the curb. She went back to the window and the boy was then lying in the street. Mrs. Malloway was notified of the accident immediately after it happened. Testimony was introduced on the part of defendants to show that on an unpaved road, or where there is dust or gravel on a paved road, such as here, it requires more distance to stop an automobile after the brakes are applied than on a clean, paved road. The above is substantially all of the evidence bearing upon the question of negligence.

It is apparent from the foregoing that if the appeal herein were one taken from the judgment entered on the verdict in favor of defendants, it would be held that the evidence narrated would be legally sufficient to sustain such judgment. But that is not the situation. We are here dealing with an appeal from the order of the trial judge granting a new trial, and therefore on such an appeal in reviewing the evidence we are governed by an entirely dif-

580

ferent rule. ■ As said in *Moss* v. *Stubbs,* 111 Cal. App. 359 [295 Pac. 572, 296 Pac. 86], ·the well-settled rule is that the matter of granting or refusal to grant a motion for a new trial is largely within the discretion of the trial court (*Work* v. *Whittington,* 61 Cal. App. 302 [214 Pac. 474]); that in passing upon such motion the trial court is not bound by the rule of conflicting evidence as is the appellate tribunal (*Huckaby* v. *Northem,* 68 Cal. App. 83 [228 Pac. 717]; *Smith* v. *Royer,* 181 Cal. 165 [183 Pac. 660]; but must weigh and consider the evidence for both parties and determine for itself the just conclusion to be drawn from it (*Green* v. *Soule,* 145 Cal. 96 [78 Pac. 337]; *Rudin* v. *Luman,* 53 Cal. App. 212 [199 Pac. 874]); and if it is satisfied that the finding of the jury is contrary to the weight of the evidence it may grant a new trial. (*Gordon* v. *Roberts,* 162 Cal. 506 [123 Pac. 288].) ■ Even where the evidence is not conflicting and all the proof seems to be favorable to one or the other of the parties litigant, the question of the probative force or the evidentiary value of the testimony is nevertheless within the determination of the trial court in a proceeding on motion for a new trial. (*Otten* v. *Spreckels,* 24 Cal. App. 251 [141 Pac. 224]; *Roberts* v. *Southern Pac. Co.,* 54 Cal. App. 315 [201 Pac. 958].) ■ Therefore, under the law as thus declared it is beyond the power of the reviewing court to interfere with the determination of the trial court unless a manifest abuse of discretion appears (*Campanella* v. *Campanella,* 204 Cal. 515 [269 Pac. 433]; *Buck* v. *Borchers,* 203 Cal. 210 [263 Pac. 226]), or there is no substantial conflict in the testimony on material issues and the evidence as a whole is insufficient as a matter of law to support a verdict in favor of the moving party. (*Springer* v. *Pacific Fruit Exchange,* 92 Cal. App. 732 [268 Pac. 951]; *Wendling etc. Co.* v. *Glenwood etc. Co.,* 153 Cal. 411 [95 Pac. 102]; *Empire Inv. Co.* v. *Mort,* 169 Cal. 732 [147 Pac. 960]; *Harvey* v. *Machtig,* 73 Cal. App. 667 [239 Pac. 78].) ■ The California Vehicle Act, as it stood at the time this accident happened, besides fixing a speed limitation of twenty miles an hour for driving automobiles in a residential district, provided that such vehicles should be driven at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface

and width of the highway, and at such speed as would not endanger the life, limb or property of any person; and in holding that the evidence in this case did not justify the implied finding of the jury that the Hughes automobile was not negligently operated, the trial court must necessarily have refused to accept the testimony given by Betty Hughes and Mrs. Perrin as to the manner in which the accident happened, and based its conclusion that the automobile was negligently operated upon the admission of Betty Hughes that she saw the children some sixty feet away playing near the street, and upon the physical conditions found to exist after the accident, the screeching of the brakes and the testimony given by the Turner boy to the effect that the Malloway boy "was walking slow in a straight line across the street" when he was struck and that at that time the Hughes car was traveling about thirty-five miles an hour. And in view of the broad powers vested in the trial judge on motion for a new trial in determining the weight that shall be given to the evidence, we are not prepared to hold as a matter of law that the inference drawn by the trial court is wholly unsupported by the facts above mentioned.

    Appellants point out that according to the testimony given by Betty Hughes, as soon as she saw the children she sounded her horn and reduced her speed to less than eighteen miles an hour by taking her foot off the gas accelerator; and that she explained the marks in the street by saying that after the boy darted from the sidewalk into the automobile and she felt the slight thud she speeded up to avoid colliding with the oncoming Perrin car. Furthermore, as appellants point out, there are certain circumstances tending to show weakness in the testimony given by the Turner boy as to the speed of the Hughes car. In this regard it would appear from the map which was used at the trial that he was unable to see the movement of the Hughes car until almost immediately before the impact at the corner because according to his testimony he had just emerged from "behind the Malloway house from the rear" and was going toward Harriet Street at the time the accident occurred, and it would seem, therefore, that not only did the Malloway house obstruct part of his view of High Street, south of Harriet, but, as he testified, there was also

a chalkrock wall "a little higher than" he was in front of the Malloway house on Harriet Street, extending toward but not up to High Street. Moreover, according to the record, his estimate of the speed the Hughes car was traveling was based upon the fact that on the morning of the trial, which took place some seven months after the accident, he was driven in an automobile at a speed of twenty, thirty, and forty miles an hour and he watched the speedometer. Whether or not he was driven along High Street over the same course taken by Betty Hughes on the day of the accident, does not appear. However, as already shown, under the decisions above cited, on motion for new trial the matter of the credibility of the witnesses, the weight and the probative force that shall be given to their testimony, and the question of the evidentiary value of physical facts, are all within the determination of the trial court; and therefore in the present case we are not at liberty to interfere therewith on appeal.

██ Appellants make the further point that contributory negligence was established as a matter of law. The point is based mainly upon the admitted fact that Mrs. Malloway saw the child playing in High Street shortly before the accident and made no effort to get him off the street; and appellants argue therefrom that it was the height of contributory negligence on the part of the mother to permit her infant to play in a public street unattended on the morning of the 4th of July, when a parade was about to take place in the city and when she must have known of the increased dangers from excitement and traffic. It appears to be definitely settled in this state now, however, that where, as here, the action is brought by the infant in his own right for injuries sustained by him, and is not one filed by the parents to recover damages suffered by them as a result of their child's injuries, the negligence of the parents cannot be imputed to the child. (*Zarzana* v. *Neve Drug Co.*, 180 Cal. 32 [15 A. L. R. 401, 179 Pac. 203]; *Caraveo* v. *Pickwick Stages System*, 113 Cal. App. 443 [298 Pac. 516].) Therefore, we find no merit in appellants' point.

The order appealed from is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 28, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 27, 1932.