[Civ. No. 16342.   Second Dist., Div. One.   Oct. 18, 1948.]

ELSIE L. McCOY, Appellant, v. YELLOW CAB COMPANY (a Corporation), et al., Respondents.

Bodkin, Breslin & Luddy for Appellant.

Harry B. Ellison, James L. Ronnow, Parker, Stanbury & Reese and Harry D. Parker for Respondents.

YORK, P. J.—This is an appeal from an order granting the separate motions for new trial of defendants Yellow Cab Company and Allen Joseph Sitzer, the cab driver; and Clarence Furlong and Rose G. Furlong, after the jury had returned a verdict against them in the sum of $20,000 on account of personal injuries sustained by plaintiff on April 28, 1946, when a yellow cab in which she was a passenger collided with the automobile of the Furlongs.

In granting such motions the trial court commented as follows:

"The motion will be granted as to defendants Furlong. I remember the evidence very well and as to them, I do not think there was any evidence to support a verdict against them. Mr. Furlong sat a considerable time waiting to cross Beverly Boulevard; finally an opening presented itself. He was proceeding very slowly, was more than half way across the street. In other words, he was past the center line dividing the northern and southern half of Beverly, and he was struck by this taxicab. He had the right of way and he had no reason to believe he would be deprived of that right of

way. I cannot see any merit to it. The motion is granted as to Furlong.

"As to the Yellow Cab Company, the only question here, it seems to me, is the amount of damages.

"This plaintiff was a chiropractor and she had the evidence of one or two chiropractors and also one or two real doctors, and the evidence of the doctors who testified in her favor was dependent entirely upon her own statements, upon the subjective symptoms that she related to them.

"The doctors who examined her found nothing objective, nothing that they could put their finger on to find out what was wrong with her. The impression I received during the trial was she was seeking to pad her injuries to the greatest possible extent.

"Of course, these doctors who testified had a right to believe what she gave as a history of the case. I think they were misled by that history, and I think the woman was not hurt at all.

"The motion will be granted for a new trial as to defendant Yellow Cab Company, unless the plaintiff will agree to reduce the amount of the judgment based upon the verdict from twenty thousand dollars to three thousand dollars. Otherwise, the motion is granted.

"Counsel for plaintiff may have five (5) days from and after today to announce their willingness either to accept or their desire to reject the matter of reduction of the amount.

"Mr. Parker: And your Honor, I assume that order will be on the insufficiency of the evidence to support the verdict?

"The Court: Yes, it would have to be, because the evidence is insufficient to support the verdict as to twenty thousand dollars. I think the jury just went hog wild with somebody else's money.

"Mr. Bodkin: Is the new trial granted as to the question of liability?

"The Court: As to all questions.

"Mr. Bodkin: The plaintiff will not accept the reduction.

"The Court: Then the motion will be granted as to the Yellow Cab Company on the grounds of insufficiency of the evidence and excessive damages."

It is here urged by appellant that the trial court was guilty of an abuse of discretion when it granted the new trials.

The circumstances out of which the collision occurred are as follows: Clarence Furlong testified that driving a Buick sedan on Sunday evening, April 28, 1946, southerly on Beach-

wood Drive, he approached its intersection with Beverly Boulevard, where his passage was blocked by a double line of westbound traffic which was stalled by reason of a traffic light at Larchmont; at the stop sign on Beechwood he waited "probably three or four minutes"; that traveling very slowly he edged into the first line of cars on Beverly when someone in that line moved up a bit; that one car in the second line of traffic backed up a little to permit him to go on through; that he did not have to wait for the second line to open up; that as he came out of the second line near the center of Beverly he first saw the Yellow cab; that it was right in front of him; that as he crossed the street, he saw the reflection of lights coming from the west; "the light of an approaching headlight, whatever it might be" which appeared to be about 70 feet to the west; that he continued straight ahead "at a very slow speed thinking that the other vehicle would let me go on by." That he did not sound his horn or use his brake just prior to the collision.

Respondent Sitzer, the driver of the Yellow cab, testified that on April 28, 1946, with appellant as a passenger, he was driving east on Beverly Boulevard in the traffic lane next to the double center line; that as he approached Beechwood Drive he observed no opening in the westbound traffic which was stalled at the intersection; that as he crossed the westerly curb line of Beechwood, he first saw the headlights of the Furlong car coming from behind two stalled cars; that he was driving approximately 25 miles per hour and the Furlong car was traveling at a speed of 10 to 15 miles per hour; that he was about 15 feet from the Furlong car when he first observed it; that he heard his brakes screech and skidded about 8 feet after the impact with the Furlong car; that when the two cars came to rest after the collision "the left front fender of the cab and the right front fender of the other car involved were locked together"; also that the "divider glass immediately behind the driver's seat (of the Yellow cab) was shattered"; that he got out of the cab, "opened the rear door of the passenger compartment to find out if the passenger had been injured"; that he found her (appellant) seated on the floor with part of the seat down over her and her head in the vicinity of the shattered glass; that appellant appeared dazed and excited; that he asked her if she was hurt and she replied that she didn't think so.

Appellant, a doctor of chiropractic, testified that at the time of the collision she was a passenger in the Yellow cab

and was on her way from Hollywood to the Good Samaritan Hospital to see a friend and patient; that she "was thrown with great force against the glass behind the driver, shattering the glass; and then with a terrific recoil in the bottom of the cab; and the large seat was thrown over my abdomen and the jump seat over my legs. . . . I was dazed"; that Mr. Clark, representative of the Cab Company, took her to the Hollywood Receiving Hospital where she was examined; that she had blood on her left cheek, her lips were swollen and her legs bruised; that she did not believe at the time that she was seriously injured; that Mr. Clark drove her to the Good Samaritan Hospital, where she became ill, was in a dazed condition and felt nauseated; that Mr. Clark then took her home; that her brother who lived with her was not at home; that she felt dazed and was ill during the night; that she was not able to sleep and was not able to treat her patients on the following day; that the next day she was taken to the office of Dr. Cunnane, who examined her and had X-rays taken of her neck, head and shoulder; that upon her return home she collapsed and from that time on became very ill; that the entire left side of her head was badly bruised and there was quite a bump on the upper half, above the eye; that she had severe pain in the back of the head, behind her left ear and down the shoulder and in the mid-dorsal region and suffered from nausea; that an agent of the cab company called and suggested sending the company's doctor to see her; that evening Dr. Anderson of the cab company called; that he said she was suffering from shock and concussion and told her to stay in bed for two weeks and keep an ice pack on her head constantly; that at that time she had a severe pain in her mid-dorsal region and through her shoulder and ear; that this pain started the second day after the accident and kept on continuously. Dr. Anderson gave her sedatives to relieve the pain and induce sleep; that she followed his advice; the nausea and vomiting continued and there was pain and pressure behind her right ear; that during the time that Dr. Anderson was attending her she had no other M. D., but that Dr. Eacrett, a chiropractor, called to see her and gave her treatments; he tried to relieve the tension in her shoulder which she was unable to move; that before the accident she had had no trouble with her right arm or right shoulder and all the time she practiced in Los Angeles she had been able to do sacroiliac work, which required strength; that until this injury she had sufficient strength

to do that work and was able to handle big as well as small men.

Appellant further testified that she was also treated for five months by Dr. Thomas Glenn, another M. D., to whom she went the last of May, 1946; that he examined her and had X-rays of her abdomen taken by Dr. Davis at St. Vincent's Hospital; that after examining the X-rays, Dr. Glenn taped appellant's abdomen and upper back, which relieved the pain whereupon the nausea and vomiting discontinued. Meanwhile, appellant with the permission of Dr. Anderson took a trip to Iowa to visit her sister, who was also a chiropractor, it being Dr. Anderson's opinion that it would benefit appellant's nerves to get away; that her nerves were very bad at that time, she was having nightmares and suffered pain in her shoulder, head and neck; that she was under sedatives and her brother bought her railroad ticket and took her to the station in a taxicab; that her sister met her in Iowa and put her to bed and treated her for two weeks, when she returned to California by train; that although the pain in appellant's ear continued, she felt better and believed she was improving; that she arrived home the last of June and attempted to treat a patient on June 28th, but was unable to complete the treatment and was in bed for several days. That about July 1st, she was able to treat some patients; that she was ill when she treated the first patient but afterwards was better; that first she tried two patients and then three; that before her injury she treated on an average six to eight patients a day, devoting an hour to each one, working regularly five days a week and in the first three or four months of 1946 she averaged $550 per month; that her business was done on a cash basis and she had a number of regular patients, consisting of secretaries, executives, actors, actresses and judges. She further stated that since her return from Iowa she had been able to work some days and others not; that she had not been able to treat all the patients who came to her, the maximum number being four a day; that sometimes when they came she was unable to treat them because of her illness, and lost patients as a result; that during the balance of 1946 her income was about one-half of what it was the first three months of 1946; that since her return from Iowa the pain in her head had been very severe, with continuous pressure behind the ear and at the base of the brain. Further, she consulted Dr. Adelstein, a brain specialist, and also Dr. John B. Doyle, who examined her for the first time

in October, 1946; that the pain in her back was aggravated when she did heavy work, consequently she was unable to do much sacroiliac work; that when she did such work she became very sick.

Appellant also testified that following the injury she had a lack of balance, pitched forward and to the right, was quite nervous and seemed to be stuttering much of the time for two weeks; that she eventually recovered her balance and speech. At the time of the trial herein, she still had pressure back of her ear and her right shoulder was very painful when she tried to move it; there was a click and the ligaments gave way entirely; also she had a bad pain in the mid-dorsal region; however, at times she felt she was getting better.

Dr. Budge, who examined appellant at the Hollywood Receiving Hospital at the time of the collision, testified that she was able to answer questions intelligently, and his examination revealed that she had a half inch scratch on the left side of her face, contusion of the left frontal area and of right forearm and sprain of right cervical area; that there was no record of any brain injury or evidence of concussion; that appellant was conscious at all times and there was no evidence of nausea or vomiting; that the record showed that appellant was in the hospital for six minutes on the night of her injury.

Dr. Cunnane, who examined appellant the day following the injury, testified he found "swelling and contusion of the left frontal region of the head with slight discoloring, contusion and swelling and discoloration of the left upper lip, contusion, swelling and limited motion of the right upper posterior of the neck, contusion, swelling and limited motion of the left arm in the intra-verticular region. Contusion and swelling and discoloration of the right forearm and slight discoloration of the right calf, and the right shoulder was painful on motion and there was some limitation of motion and crepitus was felt in elevation. . . . She was extremely nervous. I didn't have a record of her having been knocked completely unconscious at the time but she could have suffered a concussion without complete unconsciousness." This doctor examined her again on May 22, 1946, and found that "her scalp was sore to the touch. . . . her back showed a slight curvature to the left opposite the 11th dorsal vertebra; the muscles of the back were rigid and there was a few fibrous lumps in the posterior neck." That the next time he saw the patient was June 25th, when she complained of "pain behind

the left ear and down the shoulder to her fingers. This was aggravated by her work. She said she was nervous and frequently nauseated. She stated she felt very good until she started back to work but couldn't carry on her work and that it caused her severe pain from her neck to her shoulder and down the arm.'' On cross-examination, this doctor testified that when he saw appellant for the last time on June 25, 1946, he found no objective evidence of injury or damage at that time.

Dr. Davis who took X-rays of appellant on the day following the accident, testified that one of them showed a drop in position of the kidney a little over 6 centimeters, that is a little over 2 inches, but he had no knowledge how long this condition had existed.

Dr. Thomas B. Glenn testified that appellant consulted him on May 28, 1946; that he took her history in detail and then started to study her from head to foot; that she complained of a pain in the shoulder, and in the epigastric region and complained of a lump in her abdomen, on the right side and below where the kidney should be; that he felt the lump and determined it was the kidney; that he examined the X-rays taken by Dr. Davis, one of which showed the kidney ''down in an abnormal position, a little over six centimeters''; that he found the liver had dropped about two fingers below the normal limit, that is in a prone position; that the patient complained of nausea, vomiting; that he used adhesive tape and lifted the organs into place and strapped her up, which immediately relieved that condition; that she had a pain in the ear, there was a scab in the outer right ear ''so that she had some injury there . . . which left a scab. . . . it was not recent; the muscles of the right arm were very tender and she had difficulty in raising the right arm . . . and the neck has been tender every time I have seen her.'' This witness gave as his opinion that the collision could have caused the displacement of the kidneys and liver; also that there was a causal connection between the pains behind the appellant's ear and headaches and the collision.

Dr. John B. Doyle, an M. D., testified that he first examined appellant at his office October 16, 1946, when he took a complete history, did a general physical examination, an opthalmoscopic examination and a neurology examination, and concluded therefrom, ''assuming the history she gave me is true, to me it would appear that as a result of the accident on April 28, 1946, the patient sustained a mild concussion of the brain,

involving the soft tissue of the scalp and thorax or chest. The symptoms referable to these injuries are gradually diminishing or have disappeared. The symptoms which have developed more recently are due to mental causes associated with anxiety about her condition, her future earning power and the possibility that she may be developing some progressive pathology, that is, some progressive disease process. The last time I saw Dr. McCoy was on April 28th of this year, at which time I just interviewed her. I think that her tension was as marked or more marked than it was in October, and her depression of spirits, her melancholic trend was a little more marked.''

Dr. Elmer T. Anderson, a medical doctor for the Yellow Cab Company, testified that he first saw appellant at her apartment on May 2, 1946, having been requested to call upon her by the company. That Dr. McCoy was lying on a sofa and he took her blood pressure and that there was nothing abnormal or subnormal in the blood pressure which he found; that she was complaining of pain throughout the left side of the forehead and muscle and ligament soreness throughout her shoulders, legs and knees; of dizziness when standing and some nausea; that there was some swelling and redness of the skin on the left arm and left side of the forehead, but no lacerations were seen; that he did not recall any injury to the mouth; that the bump on the head was a minor contusion; that altogether he saw appellant four times: May 2, 3, 7, and 15, 1946; that he had a conversation with appellant after May 15th, in which she stated she was planning a trip to Iowa to visit her sister and that she would communicate with him upon her return around the first of June, but that he received no further communication from her. He further stated he had no memory of appellant complaining of suffering any discomfort in the region of the kidneys during the time he saw her from May 2 to 15; that his diagnosis of the case was a mild contusion of the soft tissues over the left side of the forehead and left eyebrow with subjective complaint of pain and vertigo, suggesting a mild cerebral concussion; that he estimated a three week period of total disability and in addition temporary partial disability of three weeks, but that he saw nothing that would suggest any permanent disability. During the period that he treated her, this witness stated he observed no evidence of nervousness except that ordinarily induced by such an accident; and found no evidence of permanent injury or damage to the nervous system.

Dr. F. Earl Brown, a medical doctor, testified he made an examination of appellant on March 7, 1947, and made a written report of his findings to the respondent Yellow Cab Company. Briefly, the witness stated he found no evidence of injury on the top of the head; that the left side of the face had returned to normal; there was no scar there; no evidence of injury to the mouth or lips; the nose was intact; the pupils were equal, that is round and normal, and there was no nystagmus. That test was made because the patient had mentioned having received a concussion of the brain at the time of the accident. That the eardrums were normal and there was no variation in hearing; the scalp moved freely and was not indurated; the head moved normally in all directions; no spastic muscles were indicated, they all functioned fully and displayed no condition other than normal; the spine was in alignment and therefore not injured. She had mentioned straining the neck. In the shoulders she had mentioned a condition over the left clavicle or collarbone and that apparently had cleared when he saw her. There was no evidence of injury there. She also mentioned a condition of the right shoulder which had caused her to have pain down the arm to the fingers; the arm at the right shoulder was capable of full flexion. She complained of a click in the right shoulder and on motion he could not get a click. He did get a fricton rub at the inner end of the right collarbone which was not the result of injury. The pain in the arm was purely a subjective symptom; she had full function in all the fingers and they performed the normal function of the fingers. So with that observation there was no remaining evidence of injury to the median nerve. The evidence in regard to that was purely subjective, simply that the patient complained of it and there was no objective evidence to account for it. She complained of a contusion or bruising in the back between the shoulder blades. Here again there were no spastic muscles. They were both functioning and back bending was in normal limits. The chest extended normally and equally on the two sides and if there had been any injury there at any time the evidence had disappeared and it was not there when he examined her. In the chest the heart and lungs were normal; the blood pressure normal for a person of her age. The heart action was normal. Her lung sounds were clear and there were no rales and no friction signs and they seemed to be normal.

In the abdomen there had been a history of ptosis of the liver or kidney. They were not enlarged. The right liver could not be felt on inspiration. It did not come down far enough to feel it between the two ends of the side of the abdomen. Otherwise the abdomen was within the normal. The lower extremities functioned fully. There was no evidence of injury there. All of the nerve tests were within the normal except for a slight tremor in the extended arms and fingers. In the Romberg test she was perfectly normal. Coordination was normal on the two sides. The reflexes were present and active and there were no pathological reflexes. Her gait was undisturbed. The patient appeared to be normal and active and quite pleasant during the whole examination and manifested no evidence of any physical disability.

This witness explained that the Romberg test is given primarily to determine whether there is any abnormal condition either in the brain or the spinal cord. It is made by having the patient stand with heels and toes together and standing erect with closed eyes. If the test is positive the patient will sway from side to side; if it is negative, the patient will stand still.

It was this doctor's opinion that if appellant had had any injuries at all that she had fully recovered from them.

■ On the question of the propriety of granting a motion for a new trial, the Supreme Court in *Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d 357, 358 [170 P.2d 465], stated:

"This court has recently reiterated the settled rule that the granting of a motion for a new trial rests within the discretion of the trial judge to such an extent that an appellate court will not interfere unless an abuse of discretion clearly appears. All presumptions are in favor of the order, and it will be affirmed if it is sustainable on any ground. (*Mazzotta* v. *Los Angeles Ry. Corp.,* 25 Cal.2d 165, 169 [153 P.2d 338], and cases cited. The trial court in considering a motion for a new trial is not bound by a conflict in the evidence, and has not abused its discretion when there is any evidence which would support a judgment in favor of the moving party. (*Estate of Green,* 25 Cal.2d 535, 542 [154 P.2d 692]; Hames v. *Rust,* 14 Cal.2d 119, 124 [92 P.2d 1010].) The only conflict may be the opposing inferences deducible from the uncontradicted probative facts. In such case the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for 'it is only where it can be said as a matter

of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court.' (*Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305, 307 [163 P.2d 689] ; *Malloway* v. *Hughes,* 125 Cal.App. 573, 580 [13 P.2d 1062].)''

The motion for new trial was granted as to the respondents Furlong on the ground of insufficiency of the evidence to support a verdict against them. An examination of the record as to their participation in the collision, briefly shown in the foregoing resumé, discloses evidence to the effect that the Furlong car was half way through the intersection when the Yellow cab reached the westerly curb line of Beechwood as it entered the intersection. Since this would tend to support a verdict in favor of the respondents Furlong, the order granting a new trial will not be disturbed. (*Ballard* v. *Pacific Greyhound Lines, supra.*)

As stated in *Hays* v. *Service Tank Lines, Inc.,* 74 Cal. App.2d 577, 581 [169 P.2d 249] : ''In ruling upon a motion for a new trial, a trial judge must review the evidence and pass upon its sufficiency, and if he concludes that the verdict has resulted in a miscarriage of justice it is his duty to grant the motion for a new trial. (*Grover* v. *Sharp & Fellows etc. Co.,* 66 Cal.App.2d 736, 737 [153 P.2d 83].)''

As to respondents Yellow Cab Company and Sitzer, the motion was granted on the grounds (1) that the evidence is insufficient to support the verdict for $20,000 and (2) of excessive damages.

In this connection appellant argues that the statement of the trial court that a new trial would be granted ''unless plaintiff within five days consented to a reduction of the verdict from twenty thousand dollars to three thousand dollars, implies a finding that the cab company and its driver were liable.''

Assuming that appellant's argument in this regard is correct, it would not constitute sufficient ground upon which to base a reversal of the order.

The record in this case is voluminous. However, the very brief outline of evidence adduced at the trial which is above recited clearly discloses a conflict on the questions of (1) the extent of the injuries suffered by appellant, and (2) whether by reason of the injuries sustained, she has become permanently disabled in the practice of her profession as a chiropractor.

"The action of the trial court in granting a new trial upon the ground of insufficiency of evidence is so far a matter within its discretion that if there is any appreciable conflict in the evidence, its ruling is not open to review." (20 Cal.Jur., § 71, p. 112, and cases there cited.)

Notwithstanding the many facetious, but harmless, remarks made by the trial judge during the trial and at the time the instant motions were argued, the record establishes the fact that he believed the evidence presented was insufficient to support a verdict against respondents in the sum of $20,000 and that such verdict was excessive.

In this connection, a statement made by the court in *Koyer* v. *McComber*, 12 Cal.2d 175, 182 [82 P.2d 941], is applicable:

". . . where a trial court grants a new trial upon the ground that the verdict is excessive, the declaration of the court that it is excessive does not necessarily mean that the trial court was of the opinion that the verdict was the result of passion or prejudice. It is susceptible of the interpretation that the trial court was not satisfied that the finding of the jury as to the extent of damage suffered by the plaintiff was supported by the evidence adduced upon that phase of the case. (*Meinberg* v. *Jordan*, 29 Cal.App. 760 [157 P. 1005, 1007].)''

In *Ballard* v. *Pacific Greyhound Lines, supra* (28 Cal.2d 357, 361), the following rule is enunciated:

"It was the province of the trial court on the motion to weigh the conflicting evidence and inferences on all the issues, including the question of the extent of plaintiff's injuries, and to judge the credibility of the witnesses. The ground of insufficiency of the evidence to justify the verdict extends to the quantum of the injuries as well as to the issues relating to the defendant's liability. (See *Phillips* v. *Powell, supra*, 210 Cal. 39, 42 [290 P. 441].) It is necessarily inclusive, and the specification by the court on the ground of insufficiency indicates an examination into the evidence on all of the factual issues.

"It has long been the settled rule in this state that the statement of the ground of the order granting a new trial does not preclude the reviewing court from considering the entire record on the appeal from the order. The review is not restricted to a consideration of the ground mentioned in the order. In fact it is the duty of the court on appeal to consider the entire record upon which the order was based to discover whether there is any error which would have justified the trial court in making the order, and if so the

order will be sustained although the grounds urged on the motion (with the exception of the ground of insufficiency of the evidence) were not specified in the order. (*Cahill* v. *E. B. & A. L. Stone Co.*, 167 Cal. 126, 129 [138 P. 712]; *Weisser* v. *Southern Pacific Ry. Co.*, 148 Cal. 426, 428 [83 P. 439, 7 Ann.Cas. 639]; *Kauffman* v. *Maier*, 94 Cal. 269 [29 P. 481, 18 L.R.A. 124]; *Scott* v. *Renz*, 67 Cal.App.2d 428, 432 [154 P.2d 738].) Since 1919 the reviewing court may not consider the ground of insufficiency of the evidence to justify the verdict unless it is stated in the order. (Code Civ. Proc., § 657.) And where that ground is specified in the order there is no doubt that the reviewing court may conclude that the trial court was justified in granting the motion on the ground that the verdict was excessive, if the record warrants that conclusion. (*Phillips* v. *Powell, supra,* 210 Cal. 39, 42.) ''

In the circumstances presented by the record herein, there was no abuse of discretion by the court in the granting of the motions.

The order appealed from is affirmed.

Doran, J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 16, 1948. Carter, J., voted for a hearing.