[Civ. No. 8543. Third Dist. Apr. 6, 1955.]

RUSSELL E. BRUNS, Respondent, v. SOUTHERN PACIFIC RAILROAD COMPANY (a Corporation) et al., Appellants.

Jones, Lane, Weaver & Daley and Richard Daley for Appellants.

Casey C. Carr for Respondent.

SCHOTTKY, J. — Respondent commenced this action against appellant railroad company and its employees for damages resulting from a collision between his truck and trailer and a locomotive and tender of appellant railroad company at a crossing in the city of Lodi. The jury returned a verdict in favor of appellants and judgment was entered upon said verdict. Respondent made a motion for a new trial upon the following grounds: (1) insufficiency of the evidence; (2) that the verdict is against law; and (3) errors in law occurring at the trial. The trial court granted respondent's motion upon all of said grounds and this appeal is from said order.

The only ground urged by appellants for a reversal of the order is that the trial court abused its discretion in granting the motion for a new trial because respondent's own testimony and nonconflicting evidence established that he was guilty of contributory negligence as a matter of law, in that his conduct shows that he exercised no care.

The rules applicable to an appeal from an order of the trial court granting a motion for a new trial on the ground of the insufficiency of the evidence are well settled and are succinctly expressed in the recent case of *Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d 357, at page 358 [170 P.2d 465], as follows:

". . . the granting of a motion for a new trial rests within the discretion of the trial judge to such an extent that an appellate court will not interfere unless an abuse of discretion clearly appears. All presumptions are in favor of the order and it will be affirmed if it is sustainable on any ground. (*Mazzotta* v. *Los Angeles Ry. Corp.,* 25 Cal.2d 165, 169 [153 P.2d 338], and cases cited.) The trial court in considering a motion for new trial is not bound by a conflict in the evidence, and has not abused its discretion when there is any evidence which would support a judgment in favor of the moving party. (*Estate of Green,* 25 Cal.2d 535, 542 [154 P.2d 692]; *Hames* v. *Rust,* 14 Cal.2d 119, 124 [92 P.2d 1010].) The only conflict may be the opposing inferences deducible from uncontradicted probative facts. In such case the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for 'It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court.' (*Brooks* v. *Metropolitan*

*Life Ins. Co.*, 27 Cal.2d 305, 307 [163 P.2d 689] ; *Malloway* v. *Hughes,* 125 Cal.App. 573, 580 [13 P.2d 1062].) ''

It appears from the record that the accident involved in the instant case occurred about 5:20 a. m., standard time, on September 7, 1950, within the city limits of Lodi, California. It had been raining, but at the time of the accident was clearing and possibly slightly misty. The light condition was dawn, just as the dark of night is giving way to the light of day, but it was still fairly dark when the accident occurred.

The scene of the accident was on the north side of Lodi where Highway 99, running north and south, crosses a railroad track, which runs east and west, hereafter referred to as the crossing. The highway is approximately 84 feet wide at the crossing, two traffic lanes for northbound traffic, two lanes for southbound traffic, and a parking lane on either side. Several hundred feet north of the crossing the traffic lanes narrow to a two-lane highway. Approximately 200 feet south of the crossing is an intersection controlled by traffic lights; the street intersecting Highway 99 at such point is known as Lockeford Road, hereafter referred to as the intersection. The distance from the south rail of the crossing to the north edge of the intersection is approximately 150 feet and the south edge of the intersection is approximately another 66 feet to the south. The crossing was protected by standard warning marks painted on the highway, by standard crossing signs and by a single wigwag signal located at the edge of the pavement on the southeast corner of the crossing. There are insulated joints in the railroad track located 12 feet east of the easterly edge of the highway which actuate the wigwag signal, therefore when the wheels of an engine or freight car cross the insulated joint, the wigwag should immediately begin to operate. (There is one circuit west of the highway about 875 feet and one east of the highway about 1,000 feet which also actuate the signal.) This particular railroad track was not used for passenger trains, but apparently was a line primarily used for local freight service and for picking up freight cars loaded with grapes and other fruits from points east of Lodi. This accident occurred during the grape season. Approximately 23 feet east of the east edge of the highway and 51 feet south of the nearest rail stand several storage tanks of the Union Oil Company, which are high enough to prevent one in an engine from seeing over them and blocking vision of anyone on the engine until

it is close enough to the highway to see past them. Of course the angle of vision to the south increases as the viewer gets closer to the edge of the highway and beyond the obstruction of the tanks.

The train crew of the engine involved included C. M. Dollarhide, the conductor, W. L. Powell, the engineer, who was not present at the time of the accident, Hurley E. Bishop, a brakeman, Gordon Thompson, the fireman, and Smith, a brakeman. The entire crew with the exception of Smith testified at the trial. The engine was actually operated at the time of the collision by John L. Harrison, the assistant trainmaster.

The crew went on duty at approximately 11 p. m. the night before the accident occurred and were engaged in picking up loaded cars of grapes in the vicinity of Lodi. At about 1 a. m. the next morning, Powell, the engineer, started to feel ill and his condition "continued getting worse through the morning." At about 5 a. m. he saw Mr. Harrison, the assistant trainmaster, who instructed him to stop operating the locomotive and to lie down in Harrison's automobile, which was parked near the yard office. Harrison then began to operate the engine and was operating it at the time of the accident.

Under Harrison's control the engine left the Lodi station and proceeded in an easterly direction across Highway 99. At that time the wigwag signal was in operation and the two floodlights located at the crossing were on. The engine traveled 250 to 300 feet east of the crossing until the wigwag signal stopped operating, then the engine was reversed and backed to a location 30 to 35 feet east of the easterly edge of Highway 99 and stopped. The then members of the crew left the engine and went to a nearby restaurant for breakfast. After breakfast the crew returned to the engine. Harrison, acting as the engineer, was sitting on the south side of the engine. He testified that the bell was put into operation by the fireman as the reverse movement began and that he started sounding a standard whistle crossing signal as the engine started to move. The engine proceeded at the rate of 2 to 4 miles per hour into the crossing and the collision occurred with respondent's truck on the west side of the highway center dividing line and the train came to a complete stop about 10 feet to the west of the dividing line, therefore the train traveled a distance of approximately 82

feet from the time the reverse movment began until the accident occurred and the engine ceased its movement.

At the time of the collision respondent was driving his own truck and semi-trailer, which was approximately 45 feet long and carrying a load of concrete blocks weighing slightly more than 21 tons, within the legal load limits for the road. Respondent was driving north on the inside lane, the one next to the center dividing line, of Highway 99; a truck and trailer approximately 60 feet long, being driven by a Mr. Bostwick, was also proceeding north on Highway 99 in the outside lane. This latter truck and trailer were owned by a Swanson Trucking Service and are hereafter referred to as the Swanson truck. As the two trucks approached the intersection they were running along side by side and respondent's truck was toward the rear portion of the Swanson truck. Just before the accident respondent was slowing down a little so that the Swanson truck could get ahead of him because it was less heavily loaded and otherwise the Swanson truck would have to pass respondent on the two-lane highway that they were approaching.

As respondent approached the intersection he saw the traffic lights turn green. Both trucks proceeded to cross the intersection and continue toward the crossing. The speed of the trucks at this time was between 25 and 30 miles per hour, but respondent was beginning to decrease his speed as stated above. Respondent stated that at this time the wigwag signal was definitely not operating and that he saw the wigwag arm standing still. When about in the middle of the intersection respondent saw the wigwag signal for the last time and noticed that it was not in operation. Respondent could not tell whether or not the signal started operating while he was driving the last 200 feet from the middle of the intersection to the crossing as the Swanson truck obstructed his vision of it. When fairly close to the crossing the Swanson truck swerved to its left into respondent's lane of traffic, respondent also swerved his truck to the left across the center dividing line so that the rear end of the Swanson truck would not hit his truck. Just after the Swanson truck veered over, respondent heard a crash as the tender hit the Swanson truck, and, as the Swanson truck cleared the tracks, respondent's truck and the tender collided. Respondent did not see the engine and tender or know of its presence until it hit the Swanson truck, immediately prior to its colliding with his own truck, nor did he hear any warning

whistles or bells. When the tender and respondent's truck collided, the side of the truck cab and front portion of the semi-trailer and load came in contact with the end of the tender, the west end of the tender being about 10 feet to the west of the center dividing line of the highway when all movement ceased. The rear wheels of the tender, the most westerly ones, were knocked a few inches off the rails. Respondent was stuck in the cab of his truck and someone helped pry him loose and get him out. After he was removed he noticed that the arm of the wigwag signal was swinging, but he does not remember hearing any sound of a bell from it and his position was such that he could not see whether or not the red light in it was lit.

Mr. Bostwick, driver of the Swanson truck, testified that he did not remember specifically looking at the wigwag signal as he was proceeding from the intersection to the crossing, but that he was watching the road ahead and that as such it was in his field of vision and that if it had been operating he was sure he would have noticed it. He said that when he was about 75 feet from the tracks the side of the tender appeared in the light from his headlights and that he immediately veered to his left to try to get around the tender, since he knew that he was too close to stop without hitting the side of the tender. The first portion of his truck cleared the tender, but the tender struck his trailer about in the middle. The load on this trailer consisted of another trailer being carried upside down; it was secured to the bed of the trailer upon which it was being carried by means of two chains and a cable. The force of this collision was sufficient to tear the trailer being carried loose from its mooring and throw it across the street where it struck another automobile approximately 100 feet away. The point of impact with the tender was somewhere east of the center dividing line in the lane in which respondent was driving. He did not hear any warning whistle, did not remember hearing any bell sound from the engine, and did not remember anything about any floodlights at the crossing. He was familiar with the crossing and knew the location of the single wigwag signal; he did not see it operating before the accident, but at a time after the accident and after respondent had been removed from his truck Bostwick saw the signal arm swinging, but doesn't remember any bell sound from it and he was not in a position to determine whether or not the red light in the signal was on. After the accident he did hear the engine bell ringing.

Located at the crossing were two 500 watt floodlights. There was a conflict in the evidence as to whether or not these floodlights were on at the time of the accident. Bostwick did not recall them at all, one of the investigating police officers did not know if they were on or off when he arrived. at the scene, and the P. G. & E. maintenance man, Kalk, who had charge of the time clock which turned the lights off could not say whether or not the lights were on between 5:14 and 5:25 a. m., the morning and time in which the accident occurred. Dollarhide stated that the lights were on when the engine crossed the highway going east, but did not remember if they were on at the time of the accident. Bishop, one of the train crew, stated that the lights were on that morning, but no reference was made as to whether it was before or after the accident.

Appellants make a lengthy argument in support of their contention that the undisputed evidence shows that respondent was guilty of contributory negligence as a matter of law. They argue (1) that respondent was familiar with the crossing and knew that there was a single wigwag signal protecting it; (2) that he voluntarily placed himself in a position behind the Swanson truck so that he could not see the wigwag signal for the last 200 feet of his approach to the crossing; (3) that from his position he knew that he probably could not hear a warning whistle or bell; (4) that his speed was at least 25 miles per hour when he crossed the intersection and that he maintained the same speed up to the time of the collision; (5) that the speed of the engine was two to four miles per hour; (6) that the two floodlights were on at the time of the collision, and (7) that the wigwag signal was in operation at the time of the accident.

There is no conflict in regard to respondent's familiarity with the crossing and to his position. However, there is a conflict on most of the other points set forth by appellants. The record does not show that plaintiff *knew* that because of his position and the noise of the trucks that he *probably could not hear* a warning signal; instead, he testified that he *did not* hear any whistle and that he could not say whether or not the locomotive bell was ringing, but he did not say that he *knew* that he *could not have heard* a whistle or bell if either had been sounded. With regard to the speed of respondent's truck, he testified that he had been going about 25 miles per hour, but that he was slowing up as he approached the crossing to allow the other truck to get in front of him, so that

he did not maintain that speed up to the time of collision. In respect to the speed of the engine, there does not seem to be any conflict that it was proceeding into the crossing at the rate of two to four miles per hour; however, there is a great conflict among appellants' own witnesses as to the respective location of the engine and the trucks when they were first seen, and as to the location of the train when the brakes were applied. Again, there is a conflict as to whether or not the floodlights were on at the time of the accident, as hereinbefore pointed out. And lastly, the only witness to positively state that the wigwag signal was in operation at the time of the accident was Harrison, the operator of the engine at the time of the accident. None of the other witnesses, called by either appellants or respondent, who were in a position to see the wigwag signal operating, remember that it was operating before the accident, although most of them saw the wigwag arm operating at some time after the accident. None of such witnesses testified that the red light in the signal was on. As stated, the record shows a conflict on this point and Harrison's testimony was only entitled to be given such weight as the trial court felt was due in the light of all the other evidence.

We are satisfied that not only is there a conflict in the evidence as to several of the points urged by appellants as sustaining the contention that respondent was contributorily negligent as a matter of law, but also that the conduct of respondent was *not* such that it can be said as a matter of law that he was contributorily negligent. His conduct must be viewed in the light of the surrounding circumstances, and his relative position and speed under the circumstances, mainly relied on by appellants, were not such as to enable an appellate court to rule as a matter of law that he was contributorily negligent. Respondent definitely saw that the wigwag signal was *not* operating when he was approximately 200 feet from the crossing; he was familiar with the crossing and knew that it was not used for fast passenger or freight trains, but that its use was mainly local freight service; he saw the Swanson truck continue to approach the crossing at a speed in excess of his own; immediately after the Swanson truck swerved in front of him and was hit by the tender, he then saw the tender for the first time and could not avoid the collision; he never heard any warning whistle. Also, considering that the speed of the train was two to four miles per hour, that the wigwag signal was activated when it

crossed the point 12 feet east of the highway, that such signal had not been activated when respondent was 200 feet south of the crossing and that he was going 25 miles per hour, it appears that respondent would cover the distance to the tracks in five to six seconds and in the same length of time the west end of the tender would then be only about 27 feet onto the highway, approximately 15 to 25 feet from the point of impact with respondent's truck; this is so even though the wigwag signal began operating the moment respondent lost sight of it. Either the train was moving faster than two to four miles per hour, or the wigwag signal was not working at the time warning the approaching traffic that the tender was then entering the crossing or upon it and not visible because of the darkness.

Bearing in mind the familiar rule so often stated by our appellate courts "that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion," we think it is clear that appellants' contention that the undisputed evidence shows that respondent was guilty of contributory negligence as a matter of law cannot be sustained.

Appellants in their reply brief for the first time make the further contention that the respondent was guilty of contributory negligence *per se* for violation of California Vehicle Code, section 575, which provides:

"Obedience to Signal Indicating Approach of Train:

"(a) Whenever any person driving a vehicle upon a highway approaches an interurban electric or steam railway grade crossing and a clearly visible electric or mechanical signal device gives warning of the immediate approach of a railway train or interurban car, the driver of such vehicle shall stop within fifty feet but not less than 10 feet from the nearest track of such railway but need not remain standing if he can proceed in safety."

Section 575 is applicable where the mechanical signal is in operation, but since it was not proven that the wigwag signal was in operation before the accident occurred, or within such time as to give any warning at all of the approaching

engine, such section is not applicable to this factual situation. There is no proof that the signal in the instant case, if in operation, gave any more warning than the presence of the tender and engine itself upon the crossing, and there is no proof that there ever was any violation of such section by respondent as would enable the court to say that he was negligent as a matter of law.

The trial court in passing on the respondent's motion for a new trial was entitled to weigh the evidence, and in the instant case, where, as hereinbefore pointed out, there was a conflict in the evidence and the inferences to be drawn therefrom, it cannot be held that the trial court abused its discretion in granting respondent's motion for a new trial.

The order is affirmed.

Van Dyke, P. J., and Peek, J., concurred.