**MARINE TOWING COMPANY, Inc.**

v.

**FAIRBANKS, MORSE & CO.**

**Civ. A. No. 22565.**

United States District Court
E. D. Pennsylvania.

June 3, 1963.

---

4. Apparently, these defenses should be raised before the deputy commissioner, prior to being presented to this court.

George E. Beechwood, Philadelphia, Pa., for plaintiff.

Francis Hopkinson, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case, based on the alleged breach of an implied warranty made in June 1955 to repair a tug boat engine in a skilled and workmanlike, manner, is before the court on (a) the plaintiff's Motion For New Trial (Document 46) filed after a jury verdict[1] for defendant on the issue of liability, and (b) the motions of both parties for a directed verdict made at the conclusion of all the evdence, on which motions judgment was reserved (N.T. 1359–60).

### I. Motion For New Trial

A. Contention that verdict is against the evidence and the weight of the evidence

The jury may well have accepted evidence justifying the finding of these facts, as recited in defendant's brief at pp. 1–3 (Document 51):

"Marine Towing Company, Inc., Plaintiff in this action, owned and operated the tug 'Lewis F. Boyer'. The tug was powered by a Model 35 E 14 diesel engine manufactured by Fairbanks, Morse & Co. (Fairbanks), the Defendant. This engine was extremely old, being a model which Fairbanks had not had in

[1]. The jury answered questions 1 and 5 of the Special Verdict (Document 32) submitted to them as follows:

"1. Did defendant fail to perform the engine repair work on the Tug LEWIS F. BOYER, undertaken by it in June 1955, in a skilled and workmanlike manner?

Yes or No     No

"If your answer to this question is 'yes,' please answer question 2. If the answer to this question is 'no,' please answer question 5 only.

"5. Is defendant entitled to recover $1003.53 on the counterclaim?

Yes or No     Yes"

production since 1922 (N.T. p. 15). The tug had been acquired by Plaintiff in April, 1955; had lain idle for over a year prior to that time; and after a few weeks operation by Plaintiff had burned out all the main bearings in the engine.

\* \* \* \* \* \*

"One of Plaintiff's expert witnesses, Mr. Boakes, volunteered the statement that he remembered seeing the 'Lewis F. Boyer' plying the Delaware River from his earliest boyhood (N. T. p. 551). The vessel had \* \* \* reached an age where it was economically unsound to operate, \* \* \*. When the main bearings burned out after a few weeks of operation, Plaintiff wanted the engine repaired at minimum cost and refused to go to the expense of a complete overhaul. This is \* \* \* shown by the testimony of Plaintiff's own witness, Mr. Huxford. (N.T. pp. 501–509).

" \* \* \* when Fairbanks' erector, Mr. Rabuse, went to work on the engine, he was forced to work under the most adverse conditions, with inadequate cranes; unskilled help; the vessel resting on the bottom of the river at low tide; inadequate access; no heat; etc. In addition, some of the work had to be done over because of hurricane damage (N.T. pp. 944–5).

" \* \* \* Mr. Anderson, Fairbanks' supervisor, stated positively that Rabuse was a well-qualified erector (N.T. p. 84), \* \* \*. [T]he log books \* \* \* [show] that the vessel was put back in operation in January, 1956 and operated regularly for a period of \* \* \* [several] months, without difficulty with the main bearings. When they did burn out, it was due to the fact that Plaintiff had refused to replace two cracked cylinders, (which leaked water into the lubricating oil) al-though it had been advised by Fairbanks that the latter would accept no responsibility unless this was done."

■ Under the facts in this record, the trial judge is not permitted to substitute his evaluation of the evidence for that of the jury, even if he disagrees with the jury's verdict. See Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir.1960).

B. Contention that Anderson should not have been permitted to express an opinion on the qualifications of defendant's other employees (page 13ff. of defendant's brief)

■ A qualified expert such as Anderson is entitled to give his opinion on the ability of persons working under his supervision to repair an engine such as the one on "The Boyer." [2]

As stated in VII Wigmore, Evidence (3rd Ed.), at pp. 155–6: "Testimony to *professional skill*, concerning either party or witness, when furnished by professional persons qualified to know, is also generally regarded as receivable." See, also, Mulhollen Appeal, 155 Pa.Super. 587, 595, 39 A.2d 283 (1944), quoting the above text. In Laros v. Commonwealth, 84 Pa. 200 at page 209 (1877), the Supreme Court of Pennsylvania said:

"If I have seen a workman doing his work frequently, and know his skill myself, surely, if I am myself a judge of such work, I can testify to his skill."

See, also, other authorities cited at pp. 5–6 of defendant's brief (Document 51). It is noted that Anderson did not express an opinion on the work of any of the employees of defendant in the language of question 1 as submitted to the jury. For example, the opinion of Rabuse's work (N.T. 1231) complained of at p. 14 of plaintiff's brief (Document 50) was worded:

"My opinion is that he done a very good job on this with the help

2. See Sartor v. Arkansas Gas Corp., 321 U.S. 620, 627–628, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

and the conditions as they were. That was reflected, of course, in the time that the job took and I don't think the finished product suffered any due to it."

■ The cases relied on at page 15 of plaintiff's brief are inapposite because in those cases the experts' opinions were upon the ultimate issue to be decided by the jury. For this reason, the statement in United States v. Spaulding, 293 U.S. 498 at page 506, 55 S.Ct. 273 at pages 276–277, 79 L.Ed. 617 (1935), relied on by plaintiff, is inapplicable. The trial judge made clear that the jury was free to disregard completely the testimony of any expert so that the jury could not have thought they were bound to follow the opinion of an expert on any issue. The charge contained this language at N.T. 1415–6:

"Now I am going to explain to you the proper use of expert testimony, because that is a big factor in this case. We have had Mr. Huxford and we have had other witnesses here; Mr. Boakes, for example, who testified as experts, * * * we allow experts to give what we call opinion testimony, which the average lay witness is not allowed to give under our rules of law.

" 'The rules of evidence ordinarily do not permit a witness to testify as to his opinions or conclusions. A so-called expert witness is an exception to this rule. A witness who by education and experience has become expert in any art, science, profession or calling may be permitted to state his opinion as to a matter in which he is versed and which is material to the case, and may also state the

reasons for such opinion. You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves; and you may reject it entirely if you conclude the reasons given in support of the opinion are unsound.'

"And, of course, you can accept it. But in this case, opinion testimony of experts—you see, you have got two things to consider: First, do you think the witness is a persuasive one, one whose opinion you accept? And, second, do you think he has good reasons for the particular opinion that he stated?"

C. Contention that the trial judge improperly "blamed plaintiff for delaying the case" (pages 17 ff. of plaintiff's brief)[3]

■ The first statement in the jury's presence[4] concerning delaying or prolonging the case was unnecessarily injected into the record by counsel for plaintiff at N.T. 125, as follows:

"I would ask for the withdrawal of a juror on the last testimony of the witness, not only because it completely went beyond any scope of direct examination, but because it is based upon matters which he is assuming, based upon situations in which he was not there, and further based upon the fact that these statements now are going to prolong this case probably three to four more days in bringing in—"

In view of this statement, the plaintiff cannot complain of later statements by the court, pointing out delays caused by plaintiff's counsel, in an effort to expedite a trial which took approximately twice as long as had been estimated by the pre-

---

3. With respect to delays in the progress of this case (suit was instituted 5/8/57) prior to trial, paragraph 3 of the pretrial report (Document 23) showed that plaintiff's discovery was incomplete at the time of the pre-trial conference in March 1962, and plaintiff was given leave to take seven additional depositions at that time. See order of 3/5/62 (Document 24).

4. It is noted that at least one of the trial judge's remarks concerning delay, quoted in counsel for plaintiff's brief (page 18 of Document 50, quotation from N. T. 892–3) as prejudicing the jury against plaintiff, was made in the absence of the jury, who were brought into the court room at N. T. 914.

trial judge (see paragraph 11 of pre-trial report (Document 23), estimating a trial time of 5–6 days). The accounting personnel of plaintiff [5] had failed to prepare clear summaries of plaintiff's financial records and had to be directed to prepare such summaries during the trial (N.T. 654–8, 668, 686–8, 717–9, 772, 780–1, 784, 869 ff., 894–911 & 914). Also, financial documents sought were not available when requested (e. g., N.T. 896) and all these factors, among others, contributed to prolonging the trial prior to the remarks at N.T. 1050–4 quoted at page 18 of plaintiff's brief.[6]

The trial judge made this statement to the jury during the trial and before the conclusion of the evidence [7] (N.T. 1071–3):

"Now, ladies and gentlemen of the jury, before we start this morning I do want to make one thing clear to you, and that is that during the course of almost every trial I feel that it is one of my responsibilities to expedite the trial. And this is no criticism of the attorneys, [counsel for plaintiff] or anyone else. It is just my feeling of one of my responsibilities in disposing of the cases in this court. And, of course, cases are not to be decided on questions of personality, anyway, questions of tactics. [Counsel for plaintiff] and [counsel for defendant] are both very good lawyers, and this

is a real controversy here. There is a real difference of opinion between these parties, and this difference of opinion largely, as in all cases, is a difference of opinion as to the facts, and you have got to decide these facts. That is what we have juries for.

"So you do not go out into the jury room and say, 'Well, the judge thinks [counsel for plaintiff] is taking too long, and, therefore, we should decide against him,' or 'He thinks [counsel for defendant] was interrupting the witness,' or anything of that sort. Those, of course, would be totally improper considerations for you in your decision in the case.

"You decide the case according to the issues which are submitted to you when I give you instructions. And the factual issues are ones that you have got to resolve, having listened to all the witnesses in this case.

" * * * Naturally, none of us wish the case to extend into next week and have you required to stay here beyond the time that you were committed to, that you were asked; namely, the two-week period that you were called for. However, of course, this may be possible. It is always possible that a case is held over. And I believe the summons which you got stated that at the end of it, that you might be held over. But

---

5. The difficulty counsel for plaintiff had with this personnel and the delays involved are also indicated by items in the record such as these:

Counsel for Plaintiff: "Your Honor, I think she handed me the wrong sheet the first time." (N. T. 773)

Counsel for Plaintiff: "Do you have those—Forget it. She was back there but she has gone out." (N. T. 901)

Counsel for Plaintiff: "May I ask one other situation?

"Mrs. Szajner, will you listen?" (N. T. 910)

6. In connection with the quotation at the bottom of page 18 of plaintiff's brief (Document 50), it is noted that frequently during the trial (for example, at N. T. 121, 122, 123 & 137), counsel for

plaintiff had taken time to ask for exceptions which, as an experienced trial lawyer in this court for over 35 years, he had known have not been required since adoption of the Federal Rules of Civil Procedure over 24 years ago. See F.R. Civ.P. 46.

7. The argument of counsel for plaintiff at page 25 of his brief (Document 50) that this statement came too late in the trial at a time when the jury had already made up their minds and were prejudiced against plaintiff's case is negatived by the instructions given by the trial judge to the jury on the first day of the trial that they were not to make up their minds until they had heard all the evidence and retired to the jury deliberation room (N. T. 32–3).

we are doing our best now to get this case finished by the end of the week, and if it should not be, this should not be considered the fault of either party or either counsel. This is a case where you have got some real problems to decide, and I know you are going to do it in a conscientious manner, and I would be most unhappy if I thought anything I said during the course of the case prejudiced you against or in favor of either party, because the fact that cases are submitted to you means that you can decide the matter either way. If that were not so, the case would not be submitted to you."

■■ None of the other reasons for new trial [8] require discussion, particularly in view of F.R.Civ.P. 61.[9]

■ It is true that counsel for plaintiff permitted himself to become upset on the morning of the second day of the trial, but it would be most unfair to defendant and to the other litigants in this court, who are waiting to have their cases tried, if a new trial lasting two weeks should be granted because plaintiff's counsel, having elected to call a witness who is an employee of defendant, becomes upset at the trial judge's determination of the scope of the cross-examination.[10] An examination of the transcript (N.T. 94–101, 116–136) discloses that the questions asked on the cross-examination of Mr. Anderson were within the scope of the direct examination by counsel for plaintiff; i. e., the cross-examination was as to things "legitimately growing out of or related to matters"

8. Many of the quotations in plaintiff's brief are very misleading due to omissions from the quotation (for example, the excerpts from N. T. 454–5 at page 18 of Document 50, which were statements during a criticism of counsel for defendant). The trial judge's reference to Mr. Stillwell's position with the Patterson Oil Company at N. T. 1440 was fully justified by his testimony that he was marine manager of that company (N. T. 321). The language at N. T. 1440 makes clear that the trial judge was referring to an argument of counsel for defendant and was not giving his own view of Mr. Stillwell or his testimony. Furthermore, this language of the charge related to the issue of damages which the jury never considered in view of their verdict on the issue of liability. The contention at page 19 of Document 50 that the judge's remarks to Huxford were unfair is based on misreading of the record and even plaintiff's counsel conceded at N. T. 522 ("You certainly did not, Mr. Huxford") that Huxford had not made clear, in stating his opinions as to the cause of the burning out of bearings in October 1955 and October 1956 (N. T. 464–7 & 474–9), that he had made a test of the crankshaft in early 1956 on which he was basing his opinions. Huxford's previous testimony that he had made a visit to the ship (N. T. 396) did not include a description of the check with instruments for misalignment made in 1956 (N. T. 519–521).

9. With respect to the reference to the trial judge's brother in paragraph 30 of the Motion for New Trial (Document 46), the specific procedure outlined by Congress in 28 U.S.C.A. § 144 makes it too late for counsel to complain of the relationship between the trial judge and a partner of counsel for defendant after an adverse verdict has been returned by the jury. Furthermore, an examination of the Canons of Judicial Ethics (see Canon 13) and "Legal Ethics," by Drinker (see p. 277) has failed to disclose any ruling or indication that, in a multiple judge court with a continuous list, a judge should refuse an assignment of a case handled by a lawyer who is one of 30 partners of his brother, who has had no contact with such case.

10. It should be noted that counsel for plaintiff was permitted to ask leading questions of this witness on redirect examination, even though he had not called him as a "managing agent" of an adverse party. See second sentence of F.R.Civ. P. 43(b) (N. T. 143–4). It is also noted that counsel for plaintiff, at his request, was granted leave to withdraw from further participation in the case with the understanding that his partner, who had been present throughout the trial, would represent plaintiff (N. T. 139–140, 144, 167–172), but the trial judge was informed after the next recess that counsel for plaintiff had decided not to withdraw from his participation as trial counsel for plaintiff (N. T. 185).

covered by plaintiff's examinations. See Kline v. Kachmar, 360 Pa. 396, 403, 61 A.2d 825 (1948); see, also, Sullivan v. New York, L. E. & W. R. Co., 175 Pa. 361, 366, 34 A. 798 (1896); Brown, Pennsylvania Evidence, p. 294 (Phila.1949); III Wigmore, Evidence, §§ 874 & 880 (3rd Ed.1940).[11]

## II. *Plaintiff's Motion For A Directed Verdict (N. T. 1359–1360)*

Since the jury was entitled to reject the opinions of plaintiff's experts, as pointed out at I–B above[12] and in view of the facts and authority referred to at I–A above, this Motion, on which decision was reserved during the trial (N.T. 1360), must be denied.

## III. *Defendant's Motion For A Directed Verdict (N.T. 1359–60)*

This motion is based on the uncontradicted testimony that in April 1956 there was a subsequent understanding made between the parties pursuant to which defendant agreed to do further work on the engine and give plaintiff a credit on the bills it had sent, and plaintiff agreed to pay the reduced balance due within a certain time. In view of the terms of §§ 418 and 419 of the Restatement of Contracts[13] and particularly the presumption in the latter section, the trial judge has concluded that, on this record, defendant is entitled to judgment in its favor as a matter of law.[14] The briefs of the parties on this point, which were filed prior to the trial (at the time of the argument on a motion for summary judgment), have been docketed as Documents 53 and 54.

## ORDER

And now, June 3, 1963, it is ordered that (a) plaintiff's motion for a new trial (Document 46) and plaintiff's motion for

---

11. It is especially noted that, although plaintiff's counsel objected to questions which he considered related to the foundation of the engine, he had asked the witness about it (N. T. 53) and the witness had not told him that he had not examined the foundation on which this engine rested as counsel stated to the court (see p. 100). Questions regarding the foundation were proper on cross-examination. The record also shows that the witness thereafter testified on direct regarding discussions concerning the foundation after the cross-examination had started, although he was not asked again if he had checked it (see N. T. 114–6). Also, it appears that at the place the objection was made (N. T. 100), the witness was not describing the foundation, but the crank shaft and base about which he had been questioned (N. T. 51–53).

Counsel for plaintiff also asked his witness (Mr. Anderson) many questions regarding the time it should take to disassemble and otherwise work on an engine of the type involved if good practice were used (see N. T. 42–47). Therefore, on cross-examination, it was proper for defense counsel to ask questions relative to working conditions in the instant case which would tend to show that the estimates given did not apply to the instant case, since this legitimately grew out of, and was related to, matters on cross-examination (see N. T. 123–133). Note

the language in III Wigmore, Evidence (3rd Ed.), § 880, which states in part: " * * * in the very nature of the process of Inductive reasoning, while the proponent of evidence offers it as leading to a desired conclusion, it is always open to the opponent to show that the inference desired to be drawn is not the correct or more probable one, and that some other inference than the one desired is equally or more probable, i. e., to show that some other explanation exists and thus to *explain away* the force of the evidential circumstance."

12. See, also, Sartor v. Arkansas Gas Corp., supra, 321 U.S. at 627–628, 64 S.Ct. at 728–729, 88 L.Ed. 967.

13. See, also, Cate v. Good Bros., 181 F. 2d 146, 148–149 (3rd Cir. 1950); cf. American Textile Machine Corp. v. United States, 220 F.2d 584, 587–589 (6th Cir. 1955), and cases cited at pages 8–14 of brief in support of defendant's motion for summary judgment (Document 53).

14. This suit is based on the June 1955 undertaking of defendant and the statute of limitations has run on any cause of action plaintiff might have had on the substituted agreement of April 1956. The exhibits concerning the substituted agreement are shown under question 2 on Exhibit C–2A (Index of Exhibits), which is also attached to Document 32 in the Clerk's file.

a directed verdict (N.T. 1359–60 and par. 1 of Document 34) are denied, and (b) defendant's motion for a directed verdict (N.T. 1359–60 and par. 6 of Document 35) is granted.