FRANCES ELAINE SMITH, Individually and as Administratrix, etc., Plaintiff and Appellant, v. UNION OIL COMPANY et al., Defendants and Respondents.

Magana & Olney, Mitchell Levy, Horace C. Brown and Ellis J. Horvitz for Plaintiff and Appellant.

Lillick, Geary, McHose & Roethke, Lawrence D. Bradley, Jr., Thomas H. Werdel, Jr., and Anthony Liebig for Defendants and Respondents.

KINGSLEY, J.—Plaintiff is the widow of, and the administratrix of the estate of, Eldon W. Smith, a deep-sea diver who died as a result of an attack of the "bends" (caisson disease) suffered during a dive from an offshore oil drilling ship named

the *Submarex*. The fatal dive took place on April 4, 1957, and Smith died the following day. The *Submarex* was owned, staffed and operated by defendant Louis N. Waterfall, Inc. Waterfall's employee, defendant Alex P. Metson, was the ship's captain. The *Submarex* was chartered to the CUSS group[1] to conduct offshore drilling operations, and the CUSS representative on board, Ed McLeod (an employee of Union Oil), was in charge of the drilling operation. Defendant was hired by McLeod, and his fatal dive was made in furtherance of the drilling operation.

Plaintiff commenced this action for recovery under the Jones Act (46 U.S.C. § 688), the doctrine of unseaworthiness, and general maritime negligence. The trial court granted a nonsuit as to the cause of action based on the doctrine of unseaworthiness.[2] The remaining causes of action were tried before a jury and, at the request of the parties, the following questions were submitted to the jury for special verdict, and the following verdict was rendered:

''1. Was Eldon Smith an independent contractor? No.

''2. If Eldon Smith was not an independent contractor, of which defendant or defendants was he an employee? CUSS group.

''3. Was Eldon Smith a seaman-member of the crew of the SUBMAREX. Yes.

''4. Was any one of the defendants negligent? Yes, if so, which one or ones? Both.

''If your answer to number 4 was 'no', you will not answer questions 5, 6, 7, 8 or 9 but return a verdict in favor of defendants.

''5. If your answer to question 4 was 'yes', was such negligence also a proximate cause of Eldon Smith's death? Yes.

''6. Was Eldon Smith or Charles Rennpage[3] negligent? No.

''7. Expressed in terms of percentage, to what extent did Eldon Smith's and/or Mr. Rennpage's negligence contribute to Eldon Smith's death?

''8. If you find that the Jones Act does not apply, then was the cause or causes of Eldon Smith's death such a known

---

[1]A joint venture among defendants Continental Oil Company, Inc., Union Oil Company, Inc., Shell Oil Company, Inc., and Superior Oil Company, Inc.

[2]The propriety of this action is not before us on this appeal.

[3]Rennpage was Smith's tender.

hazard or risk, that Eldon Smith assumed such hazard or risk?

"9. If you find in favor of plaintiff, what is the amount of damages suffered by Mr. Smith's estate? $165,970.00."

Thereafter, the trial court granted motions for judgment notwithstanding the verdict and, in the alternative, for a new trial. This appeal followed.

Eldon Smith was a professional deep-sea diver, 32 years old, and, at the time of his death he was "a first-class diver," in excellent health. The *Submarex* was specially rigged to perform undersea core drilling operations for the purpose of obtaining geological information in connection with California offshore oil leases. The drilling operation was programmed by the CUSS group. When a location was selected for exploratory drilling, the *Submarex* would drop anchor and start drilling. The drilling equipment was often damaged by natural causes, which necessitated repairing and relocating the drilling mechanism. Placing the drilling mechanism in its proper position is called stabbing the hole, and it was this job that decedent was employed to perform.

The members of the crew were changed weekly, except for Ed McLeod, the CUSS group representative, who was in charge of programming and supervising the drilling operation. The crew was under the maritime command of Captain Metson.

The bends is a disease which results from the change in external pressure to which the diver is exposed in rising from deep water to the surface. In order to avoid the bends, divers stay below the water on deep dives for carefully measured periods of time, called "optimum time" (not to be equated with maximum time), and their ascent is interrupted by periodic stops at designated intervals for specific lengths of time. Even with care, a risk of the bends remains. The most successful treatment of the bends is to put a diver in a recompression chamber. A less desirable alternative is to take the diver back into the water. There was testimony from a medical expert that a diver with the bends should be placed in a recompression chamber within 12 minutes maximum after the onset of the attack; and there was further testimony that all deep sea dives should be made with a recompression chamber available.

On April 3d, Ed McLeod telephoned to the shore to the Associated Divers, with which Smith was connected, for a diver to complete an operation theretofore started by one

Frank Donahue. He spoke to Charles Isbell. Isbell told him that the divers preferred to bring their own equipment on board; but McLeod told him that there was already one set of diver's gear on board and asked that another set not be brought. McLeod's statement was testified to have been: "One, the sea was rough. The second, we could only load or unload equipment at Santa Monica, not Redondo Beach and thirdly, that it would clutter up the decks no end to have two complete sets of diving equipment aboard." On this basis, Smith was picked up by his tender, Charles Rennpage, at about 3 a.m. on April 4th; and although, according to Rennpage's testimony, they had always previously taken along their own equipment, they did not do so on this occasion. As a result, when Smith's attack occurred, there was neither a recompression chamber nor a second set of diving gear that another diver could have used to take Smith back into the water.

Prior to the dive, McLeod explained to Smith the nature, extent and type of work to be performed. Smith made his dive and stayed down for 38 minutes in order to complete stabbing the hole. According to some of this testimony, this was eight minutes longer than the optimum time for the dive. Smith made several stops on his way up.

The evidence is conflicting on whether or not Smith took a sufficient number of stops for a sufficient length of time. Decedent emitted a sharp scream on the way up. Captain Metson and Rennpage agreed to pull Smith up and, when Smith was removed from his suit, he was unconscious, bluish, and there was slight bleeding from the nose. Captain Metson phoned to shore for an ambulance to be called to the pier. Although a helicopter service was available, none was called, but Smith was loaded into a launch for transportation to shore. After he reached shore, there was a wait of 20 minutes before the ambulance arrived. Smith was then taken, by ambulance, to the Long Beach Naval Shipyard, where he was placed in a decompression chamber. It was over an hour from the time Smith was brought on deck on the *Submarex* until he was placed in the decompression chamber in Long Beach. He died the next day, from the bends.

There was a considerable amount of conflicting testimony on the degree of control Smith had over his own activities. This testimony will be discussed more fully below.

■ The parties agree that federal standards determine whether or not Smith was covered by the Jones Act. (*Garrett*

v. *Moore-McCormack Co.* (1942) 317 U.S. 239 [63 S.Ct. 246, 87 L.Ed. 239].) █ And, under that act, the employer's slightest negligence imposes liability, neither contributory negligence nor assumption of risk being defenses (*Rogers* v. *Missouri Pacific R.R. Co.* (1957) 352 U.S. 500 [77 S.Ct. 443, 1 L.Ed.2d 493]), although there can be no recovery if the employee's negligence was the sole cause of his injury. (*Willis* v. *Pennsylvania R. Co.* (2d Cir. 1941) 122 F.2d 248; *Ouzts* v. *A.P. Ward & Son, Inc.* (D.C. N.D. Fla. 1956) 146 F.Supp. 733.)

Plaintiff contends that, in applying these rules of liability, the trial court usurped the fact-finding function of the jury in violation of the rules governing the respective powers and duties of court and jury in Jones Act cases, as established by federal law. Defendants contend that, as a matter of law, Smith was an independent contractor, guilty of contributory negligence and subject to the defense of assumption of risk and that, therefore, the trial court acted properly in denying recovery.

It follows that the issues before us are : (1) whether or not the trial court erred in granting a judgment notwithstanding the verdict based on its finding that Smith was an independent contractor, as a matter of law, and (2) whether or not the court abused its discretion in granting a new trial on the ground that the findings of employment, negligence, and no contributory negligence were based on insufficient evidence and against the law.

I

We turn first to examine the propriety of the order granting judgment notwithstanding the verdict. That order, if correct, determines the lawsuit and we would not have occasion to consider the order granting a new trial. However, in order to sustain the judgment it must appear either (1) that Smith was, in law, an independent contractor and also that the jury could not, on any theory, have found other than that defendants were not negligent or that, if they were, that Smith was chargeable with either contributory negligence or assumption of risk; or (2) that, if Smith was not an independent contractor as a matter of law, the jury could not have found for him on the issue of negligence.

█ At least since 1957, it is firmly settled that, in cases arising under either the Jones Act or under the Federal Employers Liability Act, it is for the jury to determine whether or not the elements of liability exist and that a judg-

ment notwithstanding the verdict may be granted only if, on no theory, could a verdict for plaintiff be supported. (*Rogers* v. *Missouri Pacific R.R. Co., supra* (1957) 352 U.S. 500; and, to the same effect: *Davis* v. *Baltimore & Ohio R.R. Co.* (1965) 379 U.S. 671 [85 S.Ct. 636, 13 L.Ed.2d 594]; *Dennis* v. *Denver & Rio Grande Western R.R. Co.* (1963) 375 U.S. 208 [84 S.Ct. 291, 11 L.Ed.2d 256]; *Basham* v. *Pennsylvania R.R. Co.* (1963) 372 U.S. 699 [83 S.Ct. 965, 10 L.E.2d 80]; *Gallick* v. *Baltimore & Ohio R.R. Co.* (1962) 372 U.S. 108 [83 S.Ct. 659, 9 L.Ed.2d 618]; *McLaughlin* v. *Eastern Engineering Co., Inc.* (D.C. E.D. Pa. 1963) 218 F.Supp. 380.)

 Tested by this standard, we conclude, for the reasons set forth below, that, in this case and on this record, the order granting judgment notwithstanding the verdict was erroneous.

### A

We think that there was clearly enough evidence to support a finding that decedent was a seaman as that term has been defined in Jones Act cases. (Cf. *Smith* v. *Brown & Root Marine Operators, Inc.* (D.C. W.D. La. 1965) 243 F.Supp. 130; and, by implication, *Williamson* v. *Daspit Bros. Marine Divers, Inc.* (5th Cir. 1964) 337 F.2d 337; *De Gaetano* v. *Merritt & Chapman Derrick & Wrecking Co.* (1922) 203 App.Div. 259 [196 N.Y.S. 573]) : and that issue like the other issues in Jones Act cases, is a jury question. *Butler* v. *Whiteman* (1958) 356 U.S. 271 [78 S.Ct. 734, 2 L.Ed.2d 754]; *Ferguson* v. *Moore-McCormack Lines, Inc.* (1957) 352 U.S. 521 [77 S.Ct. 457, 1 L.Ed.2d 511]; *Senko* v. *LaCrosse Dredging Corp.* (1957) 352 U.S. 370 [77 S.Ct. 415, 1 L.Ed.2d 404]; *Offshore Co.* v. *Robison* (5th Cir. 1959) 266 F.2d 769.)

Although we agree that the evidence strongly preponderates in favor of a finding that Smith was an independent contractor and not an employee, again, since that issue likewise is for the jury (*Baker* v. *Texas & Pacific Ry. Co.* (1959) 359 U.S. 227 [79 S.Ct. 664, 3 L.Ed.2d 756]), we can be concerned only with whether or not there was *any* evidence tending to show the employer-employee relationship.

 In determining whether or not an individual is an employee or an independent contractor, the primary test is that of the right of control. Secondary tests are whether the worker is engaged in special skills, whether he controls hiring and discharging his help, whether he provides his own equipment, whether or not the payment is by time or job, and whether or not there is a written contract describing him as an

independent contractor. (*Conasauga River Lumber Co.* v. *Wade* (6th Cir. 1955) 221 F.2d 312.) ▬ Decedent had special skills and controlled his own help, the tender, but he did not provide all his own equipment. There was a written purchase order describing decedent as an independent contractor, but this was never signed by decedent.

Evidence relating to who had the right to control decedent's activities during his dive was conflicting. Defendants elicited testimony to the effect that divers considered themselves self-employed, and Smith so listed himself in his tax return. Associated Divers, of which Smith was a member, assigned jobs to member divers, and Associated Divers billed all the clients. The captain or tool pusher informed the diver of the general plan of underwater work, but there was a great deal of testimony to the effect that the diver was solely in charge as to the mechanics of his dive. Diver Donahue testified, "I always figured when I went down I was on my own." Other divers testified that the mechanics of the dive were solely up to the diver. Also, the amount of work to be done was solely up to the diver. Charles Isbell testified, in response to defendants' statement that everything connected with the dive was the diver's responsibility, that "As far as diving went, yes," and in response to a question that the diver had complete discretion on how he would accomplish this result, Isbell said, "In the manner of diving, yes."

On the other hand, plaintiff elicited testimony tending to show that Ed McLeod hired the divers and directed the work they were to perform. Charles Rennpage, the tender, testified that the function of the pusher was ". . . to direct all of the drilling operations," and that he was the one who would "boss" the diver. Charles Isbell testified that he worked under the direction of the tool pusher and that some tool pushers were pretty insistent in their directions. McLeod testified on deposition that Metson explained to Smith ". . . where the leaks had developed and how to stop them." Metson and McLeod gave instruction, if any were needed, through the tender. Captain Metson testified that he had authority to have the diver brought up and to stop anything that wasn't safe.

Thus, although the evidence weighs heavily in favor of a finding that the diver was an independent contractor, there is some evidence tending to show that Smith may have been an employee. Usually, the status of such a worker is considered a question of fact for the jury. Only in a situation where, from all the facts, only a single inference and conclusion can be

drawn, can this problem be considered a question of law. (*Yucaipa Farmers etc. Assn.* v. *Industrial Acc. Com.* (1942) 55 Cal.App.2d 234 [130 P.2d 146].)

The fact that decedent had a highly specialized skill and was hired for a single job does not preclude his widow from recovery. It has been held that a jockey hired for a single race is an employee where there is a right to control the jockey. (*Isenberg* v. *California Emp. Stabilization Com.* (1947) 30 Cal.2d 34 [180 P.2d 11]; *Drillon* v. *Industrial Acc. Com.* (1941) 17 Cal.2d 346 [110 P.2d 64].) An aviator, under the control of another, is an employee and not an independent contractor. (*Murray* v. *Industrial Acc. Com.* (1932) 216 Cal. 340, 346 [14 P.2d 301].)

Since we cannot say that no jury could possibly have concluded that Smith was an employee, it follows that, under the standard imposed by the *Rogers* decision, and the cases following it, it was error to grant judgment notwithstanding the verdict on the independent contractor theory.

## B

Since, if Smith was an employee, the negligence on the part of the employer need play only the slightest part in producing the death, and contributory negligence and assumption of risk are not defenses, it is clear that, in light of the evidence in this case, it could not be said that findings adverse to an employer on those issues could not have been made. As a result, the order cannot be sustained on an alternative theory that plaintiff could not recover even if Smith were an employee.

For these reasons, the judgment notwithstanding the verdict must be reversed.

## II

The order granting a new trial involves other problems. The traditional rule, followed in California, has been that, in passing on a motion for a new trial in a jury case, the trial judge must himself weigh the evidence. If he concludes that the verdict is against the weight of the evidence, he may properly grant a new trial. (*Perry* v. *Fowler* (1951) 102 Cal.App.2d 808, 811 [229 P.2d 46]; *Tice* v. *Kaiser Co.* (1951) 102 Cal. App.2d 44, 46 [226 P.2d 624]; *Malloway* v. *Hughes* (1932) 125 Cal.App. 573, 580 [13 P.2d 1062]; 3 Witkin, Cal. Procedure (1954) Attack on Judgment in the Trial Court, § 15, pp. 2059-2060.)

Plaintiff insists, however, that this standard is not appli-

cable in the present case. As we understand the argument, it is two-fold: (1) That, in Jones Act and FELA cases, the policy in favor of jury determination is so strong that a new trial can be granted only if there is no evidence to support the verdict; and (2) that there is a general federal rule, applicable in state courts in cases where a federal right is sought to be enforced, which imposes a more severe limitation on the trial judge than does the state standard.

## A

Apart from a Washington case in which the court, without discussion, seems to have assumed that the test for granting judgment n.o.v. and for granting a new trial were identical (*Adair* v. *Northern Pacific Ry. Co.* (1964) 64 Wn.2d 539 [392 P.2d 830]), we can find no support for the first of these propositions. *Rogers,* and the sundry cases which have followed it (some of which we have cited above), are cases involving the granting of judgments notwithstanding the verdict, or similar actions which finally removed the jury from participation in the ultimate result. In *Zegan* v. *Central R.R. Co. of New Jersey* (3d Cir. 1959) 266 F.2d 101, a FELA case, the court reversed an order granting judgment n.o.v. (as we do here), but sustained the alternative order granting a new trial, saying (at p. 104): "We have recently had occasion to contrast the role of a trial judge in passing on a motion for judgment n.o.v. with his role in deciding a motion for a new trial. *Magee* v. *General Motors Corp.* (3 Cir. 1954) 213 F.2d 899. The one motion requires a judge to determine whether the evidence and justifiable inference most favorable to the prevailing party afford any rational basis for the verdict. The other requires that the trial judge evaluate all significant evidence, deciding in the exercise of his own best judgment whether the jury has so disregarded the clear weight of the credible evidence that a new trial is necessary to prevent injustice." More recently, in *Hampton* v. *Magnolia Towing Co., Inc.,* (5th Cir. 1964) 338 F.2d 303, a Jones Act case, the court also reversed a judgment n.o.v., but also reversed an order denying the alternative motion for new trial, saying (at p. 306): "Different standards govern the district court's refusal to grant defendant's motion for a new trial. The district court is no longer bound by the strictures of the rule of substantial evidence. If the court should find the jury verdict to be contrary to 'the weight of the evidence', it may, in its discretion, require a new trial." The court then held that, since the action of the trial judge in granting the judgment

n.o.v. necessarily implied that he regarded the verdict as being "against the weight of the evidence" a new trial should have been granted.

We are cited to no other cases, involving a new trial motion in either Jones Act or FELA cases, in which any different standard has been applied.

We cannot regard *Fassbinder* v. *Pennsylvania R.R. Co.* (3d Cir. 1962) 322 F.2d 859, which plaintiff urges on us, as standing for anything other than the rules as stated in the cases above cited. In *Fassbinder,* the court held that the plaintiff's evidence made out a case for the application of the doctrine of res ipsa loquitur, against which the defendant had tendered no rebutting evidence. Under these circumstances, of course, no verdict other than the one in favor of plaintiff, as returned by the jury, could have found any support whatsoever in the evidence and the grant of a new trial was erroneous under any known standard.

### B

Plaintiff urges, however, that *Zegan* was overruled by *Lind* v. *Schenley Industries Inc.* (3d Cir. 1960) 278 F.2d 79, a case involving an alleged breach of contract. In that case, decided by the full bench sitting en banc, the court considered, at length, the role of a trial judge in passing on a motion for a new trial. Admitting that the authorities were in conflict, the majority of the court adopted the view expressed by Professor Moore (6 Moore's Federal Practice (2d ed.) p. 3819). After distinguishing cases in which such a motion is granted for errors of law, and directing its attention to cases such as the one at bench where the motion was granted for insufficiency of the evidence, the court said (at p. 90): "But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the liti-

gants' right to jury trial.'' The court then concluded that, on the record before it, such a ''close scrutiny'' showed that the order granting a new trial in that case was an abuse of discretion.

Textual comment on *Lind* has been severely critical. (13 Stan.L.Rev. 383 (1961); 1961 Duke L.J. 308.) In the latter discussion, the writer expresses his disapproval in the following terms, which we regard as sound: ''It must be recognized and accepted that the proper extent of the trial judge's control over the jury verdict cannot be reduced to abstract 'rules of thumb.' The trial judge can achieve substantial justice in the particular case only if he is allowed to exercise broad discretion, guided by his judicial training and experience and intimate knowledge of the litigation at hand. Unlike the directed verdict or judgment n.o.v., the granting of a new trial is not a final decision on the merits of a cause of action. Rather, the power and duty to grant a new trial is vested in the trial judge so that he may require reconsideration by another jury when, after giving due deference to the jury verdict, he concludes that the verdict is erroneous. Thus, the granting of new trials on the ground that the verdict is against the weight of the evidence is an 'expedient middle ground' between the uncontrolled jury and complete judicial usurpation of the jury function.

''Broadly stated, the *Lind* decision would require that an appellate court closely scrutinize the granting of new trials in 'familiar and simple litigation' where the trial judge could not point to what the appellate court, reading a record of the proceedings below, would categorize as an 'undesirable or pernicious element.' In practical effect, the trial judge often could choose only between the limited alternatives of permitting the jury verdict to stand or of granting a judgment n.o.v. Narrowly stated, the *Lind* decision would prevent the trial judge from considering the credibility of witnesses in deciding on motions for new trial on the ground that the verdict is against the weight of the evidence. To the extent that this decision, under either of the above interpretations, restricts the expedient middle ground of the new trial, it does not merit adoption by other appellate courts.'' (1961 Duke L.J. 308, 315.) We have reviewed the federal cases subsequent to the *Lind* decision. The district court cases[4] are inconclusive both

---

[4]Consult: *Mainelli* v. *Haberstroh* (1964) 237 F.Supp. 190, 192; *Ramsey* v. *Mellon National Bank & Trust Co.* (1964) 231 F.Supp. 1, 6; *Marine Towing Co.* v. *Fairbanks, Morse & Co.* (1963) 225 F.Supp. 467, 469; *Gray* v. *Alpert* (1963) 220 F.Supp. 887, 888; *Provident Tradesmens Bank*

as to interpretation and application of the language above quoted, it usually being impossible to determine whether a denial of a new trial motion was because the trial judge felt his discretion fettered by *Lind* or whether he merely cited that case to buttress a decision against the motion independently arrived at. Of the decisions in the court of appeals which we have found, three[5] sustained the trial court in denying a new trial, and while *Lind* is relied on, are not actually authority for the doctrine herein urged—namely that the trial court's discretion to *grant* is severely limited. Two circuit court opinions,[6] one opinion in the Supreme Court of Vermont,[7] and language in three other circuit court cases,[8] all reject the *Lind* approach and sustain the trial court in granting new trials for insufficiency of the evidence.

Lacking any more clear enunciation of a federal rule, we think that, at least in this case, the action of the trial judge in granting the new trial was proper. In fact, even the *Lind* test seems to support his order. Here the chief issue was the status of decedent—an issue calling for the application of a difficult and not always clear test; the evidence, taken as a whole, strongly preponderated in favor of the defendants on that issue.

In addition, while the evidence to support the verdict finding defendants to have been "negligent" was sufficient if the "slight negligence" standard of the Jones Act were applicable, it is at least arguable whether it showed negligence

---

& *Trust Co.* v. *Lumbermens Mut. Cas. Co.* (1963) 218 F.Supp. 802, 804; *Cola* v. *Pennsylvania R.R. Co.* (1963) 213 F.Supp. 122, 123; *Attal* v. *Pennsylvania R.R. Co.* (1963) 212 F.Supp. 306, 307; *Snyder* v. *Macaluso* (1962) 204 F.Supp. 370, 373; *Bruce Lincoln-Mercury, Inc.* v. *Universal C.I.T. Credit Corp.* (1962) 203 F.Supp. 177; *Garvin* v. *American Motors Sales Corp.* (1962) 202 F.Supp. 667, 673; *Mazer* v. *Lipshutz* (1962) 31 F.R.D. 123, 128; *Freedman* v. *Philadelphia Terminals Auction Co.* (1961) 197 F.Supp. 849; *Jamison* v. *DiNardo, Inc.* (1961) 195 F.Supp. 99, 102; *Kowatch* v. *Rudnik* (1961) 193 F.Supp. 466, 469; *Blackstone* v. *Osche* (1961) 192 F.Supp. 174, 176; *Draper* v. *Erie R.R. Co.* (1960) 183 F.Supp. 899, 901; *Huddleston* v. *Crain Brothers, Inc.* (1960) 183 F.Supp. 874, 875.

[5]*Pritchard* v. *Liggett & Myers Tobacco Co.* (3d Cir. 1965) 350 F.2d 479; *Kuzma* v. *United States Rubber Co.* (3d Cir. 1963) 323 F.2d 657, 662; *Francis Edward McGillick Foundation* v. *Commissioner of Int. Rev.* (3d Cir. 1960) 278 F.2d 643, 649.

[6]*Bennett* v. *D.C. Transit System, Inc.* (D.C. Cir. 1962) 298 F.2d 325, 327 (Fahy, J., dissenting); *Tidewater Oil Co.* v. *Waller* (10th Cir. 1962) 302 F.2d 638, 643.

[7]*Grow* v. *Wolcott* (1963) 123 Vt. 490, 497 [194 A.2d 403, 407].

[8]*Mazer* v. *Lipschutz* (3d Cir. 1964) 327 F.2d 42, 49; *Brown* v. *Poland* (10th Cir. 1963) 325 F.2d 984, 986; *Silverii* v. *Kramer* (3d Cir. 1963) 314 F.2d 407, 413; *Meehan* v. *Gulf Oil Corp.* (3d Cir. 1963) 312 F.2d 737, 740.

under the usual "reasonable man" standard. Assuming that defendants had a duty to provide some means of rescue (*Sadler* v. *Pennsylvania R. Co.* (4th Cir. 1947) 159 F.2d 784, 786;[9] *The G. W. Glenn* (D.Del. 1933) 4 F.Supp. 727, 730),[10] such duty may or may not have included such measures as providing a second set of diving gear or a decompression chamber at the drill site or calling a helicopter rescue craft. Further, if the case is ultimately to be determined (as it may) on the theory of a maritime tort duty to Smith as an independent contractor, the evidence on contributory negligence and on assumption of risk could well support a finding adverse to plaintiff on those issues. It follows that the order granting a new trial was proper.

The judgment is reversed; the order granting a new trial is affirmed.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied April 20, 1966, and appellant's petition for a hearing by the Supreme Court was denied June 1, 1966.

---

[9]The case of *Sadler* v. *Pennsylvania R. Co.* (4th Cir. 1947) 159 F.2d 784, at 786, was an action for the wrongful death of a cook. The court stated that it is the duty of the vessel to provide a safe place for members of its crew; and where there is evidence that it failed to do so and proof of circumstances from which it can reasonably be inferred that injury resulted from such failure, the case is for the jury. It was said "it is of the utmost importance that life saving equipment be placed where it will be needed . . ."

[10]In *The G. W. Glenn* (D.Del. 1933) 4 F.Supp. 727, 730, it was held that the duty of the ship and owner to rescue a seaman overboard necessarily implies the duty to provide means of rescue.