[Civ. No. 31030. Second Dist., Div. Four. Apr. 3, 1968.]

JOSE M. TORRES, Plaintiff and Appellant, v. SOUTHERN PACIFIC COMPANY, Defendant and Respondent.

Magana, Olney, Levy & Cathcart, Jack Tenner and Ellis J. Horvitz for Plaintiff and Appellant.

Randolph Karr, William E. Still and Norman T. Ollestad for Defendant and Respondent.

COLLINS, J. pro tem.*—This action was brought under the Federal Employers' Liability Act (FELA), 45 U.S.C.A., § 51 et seq., to recover damages for personal injuries sustained by plaintiff on November 2, 1962, while working as a machinist on a diesel-electric locomotive at the repair shop of the defendant, Southern Pacific Company, an interstate common carrier by rail subject to the FELA.

On the date of the accident plaintiff was 56 years of age and had been a machinist in the employ of defendant for 17 years. On that date he was a member of a three-man crew working under a foreman and engaged in removing a crater pan cover from a traction motor with the aid of cable and hook equipment operated from a cab mounted on an overhead crane which moved on rails. Plaintiff was stationed in a pit, while his assistant, Moreno, was outside the pit and above him on the traction motor. The third member of the crew, Jones, was not engaged in the initial activity. The practice was for the crane operator to lower to position two cables to each of which was affixed a hook; then one hook would be placed in a hole in the crater pan and the other looped around a bar or rod, after which the crane operator, on signal, would haul in the cable causing it to become taut and to firmly hold the hooks in place. When the crater pan sticks sometimes a bar is used to pry it open. It is against safety regulations to shake

---

*Assigned by the Chairman of the Judicial Council.

the cables to break the pan loose. In this instance plaintiff encountered difficulty in placing his hook in the hole and keeping it there, so he held the hook in place with his right hand, and held the cable to the side with his left hand. Plaintiff testified that he called to the crane operator: "Up one" which was an expression commonly used and understood by the workers to mean that the cable should be taken up slowly. Instead the crane operator hauled the cable up rapidly and plaintiff's right forearm became caught between the crossbar on the frame and the crater pan. Jones, the third worker, being alerted by Moreno, used an iron bar to force the crater pan away in order to free plaintiff's forearm. Approximately three weeks prior to the accident the old cable hooks had been replaced by new hooks "which were smaller, closer hooks than the old ones." The workmen had encountered problems with the new hooks. Plaintiff testified: "The trouble was in attaching them or putting them on and also taking them off." Both plaintiff and Moreno complained to Jones, who in turn told the general foreman, Smitty, but apparently no remedial measures were taken prior to the accident. Moreno's testimony as to how the accident happened agreed essentially with that of plaintiff, except Moreno recalled plaintiff merely said, "Up," not "Up one" to the crane operator.

Immediately following the accident plaintiff was hospitalized at California Emergency Hospital where his injury was diagnosed as "severe crushing injury to the right forearm with rupture of blood vessels and extensive hemorrhage into soft tissue." Plaintiff's initial hospitalization period was about two weeks followed by outpatient therapy for an additional three months. He returned to work on January 7, 1963, and continued working until August 2, 1963. Plaintiff testified that during the entire period following the accident he felt pain in the right arm; that at times he could not open his right hand; that he performed most of his work with his left hand; that he was still experiencing pain and discomfort in August 1963 when Southern Pacific referred him to its company hospital at San Francisco where X-rays were taken and medical examinations made. He remained there one month; on his return to Los Angeles he informed the Southern Pacific doctor that he was unable to return to work because his hand and arm were not improved and needed treatment which was not given him. He did return to work on January 14, 1964, and continued to work at his regular machinist duties until April 16, 1964, when he injured his left hand while operating

an air gun with his right hand. He was referred to the Southern Pacific hospital for examination. He returned to work on May 18, 1964, and continued working up to the time of trial, although he was assigned to "light duties" and never was permitted to put in overtime work, which prior to the original accident had averaged 48 hours a month at overtime rates of one and one-half times the regular rate. On November 2, 1962, his regular hourly pay rate was $2.74 and at the time of trial the rate of $3.04 an hour. The normal work period was 40 hours a week.

At the trial on February 15, 1966, plaintiff testified that he continued to feel bad, that he had not received any helpful treatment, that he had been in continuous pain since the time of the accident; that his sleep was impaired; that he had no strength (grip) in his right hand, and at times had trouble opening his right hand and using his fingers. In addition, he added to his original complaint of arm injury claims of pains in his neck and shoulder area.

The hospital records of California Emergency Hospital covering plaintiff's admission, confinement and treatment for the period November 2 through November 17, 1962, were received in evidence. These records, particularly the nurse's notes, show that dressings were changed daily; that ice packs were applied regularly; that sedatives and other medicants were administered; that the patient complained of pains in the arm rather continuously; that after the first few nights he slept well at night; that the swelling in his fingers and arm had practically disappeared by the thirteenth day in the hospital; that he was discharged from the hospital on November 17th with instructions to return for out-patient observation on a monthly basis. The monthly reports thereafter disclosed that the patient demonstrated a relatively lower gripping power in the right hand compared to the left hand, but the doctor's report stated that the patient was not putting forth his best effort when gripping with the right hand. The doctor's last supplemental report of examination made on July 19, 1963, stated that no permanent disability was anticipated other than the existing slight cosmetic cleft in the right forearm.

A neurological surgeon, testifying for plaintiff, stated that he was engaged by plaintiff's attorney to make three separate examinations for the purpose of evaluating plaintiff's disability but not for purposes of treatment. These examinations took place on March 30, 1964, March 1, 1965, and February

14, 1966—each approximately one year apart. The doctor first saw the California Emergency Hospital records at the time of the third examination in February 1966. He did not rely on these records but upon the history given him by the patient and his own examinations. The doctor's first report to plaintiff's attorneys in March 1964 referred to a marked weakness in the shoulder girdle on the right with evidence of wasting of the scapular muscles on the right—which would be the lower half of the shoulder blade. The doctor recalled that plaintiff complained of neck pain at the time of the first examination and this is mentioned in his notes but not in his first report. The doctor acknowledged that X-rays are a diagnostic tool of the medical profession, but that no X-rays were ordered by him in March 1964, that it was on March 1, 1965, one year later, that he first ordered X-rays. On the basis of his examinations, the doctor concluded at the time of trial that plaintiff sustained injuries in the accident which resulted in various permanent disabilities, to-wit, one of the nerves supplying an area over the top of the hand and top of forearm which was never repaired and cannot now be repaired; severance of several tendons in the forearm which were never repaired with resulting inability to flex the fingers for hand grip; a loss of discrimination of sense of touch on the palmar side of the thumb and two fingers; injury to the cervical spine with involvement of two nerve roots. The doctor explained that although surgical procedures at the spinal cord level might remove pressure exerted on the nerve, they probably would not result in improvement at the terminal filaments of the nerves in the forearm, and that surgery to restore the torn muscle and tendon structures might not be successful, that the cost of all experimental surgery on the spine and arm, together with hospitalization and post-operative care, would probably exceed $3,200; that, in addition, there would be a period of convalescent disability of approximately three months. On cross-examination, the doctor admitted that he did not attribute to the accident some of the narrowing of the disc spaces between certain vertebrae as shown on the X-rays.

So far as the record discloses, defendant employer paid all emergency hospital expenses and supplied all medical services rendered at the company hospital at San Francisco.

Between November 2, 1962, and the time of trial in February 1966, plaintiff claims that he was out of work as a result of the accident a total of approximately seven months. This does not include time lost due to the second accident in April

1964 when plaintiff dislocated a thumb while operating an air gun.

The entire record of California Emergency Hospital covering plaintiff's treatment for 15 days immediately following his accident, together with certain X-ray film, were received in evidence without objection. Plaintiff rested and defendant then did likewise without calling any witnesses or offering any additional hospital records.

The jury returned a unanimous verdict in favor of plaintiff in the amount of $60,500.

Defendant's motion for new trial followed. It was based on two grounds, namely, (1) excessive damages, and (2) insufficiency of the evidence to justify the verdict.

The court granted the motion, and pursuant to Code of Civil Procedure, section 657, the court's order stated the grounds relied upon by the court and a detailed specification of reasons. The trial judge expressed the view that "the jury clearly should have reached a contrary verdict, in this; that while some support can be found in the evidence for a finding of negligence on the part of defendant, and that such negligence played some part in bringing about an injury to plaintiff, the size of the award demonstrates that the jury clearly should have reached a verdict of far less than the amount awarded, and that the jury entirely disregarded the contribution of plaintiff's own negligence to his injury . . . negligence on the part of plaintiff is clear and convincing; he was thoroughly familiar with the operation and its hazards and with this knowledge voluntarily placed himself in such a position that a sudden movement of the pan must inevitably have injured his arm in the precise way he was hurt; . . . As to contribution of the plaintiff's negligence to his own injury, it is incomprehensible to this court how any fair minded trier of fact could determine that the plaintiff contributed less than 75%."

While the trial judge's statement acknowledged that the injury to the nerves and muscles of plaintiff's right arm was severe and to some extent permanent the judge regarded the evidence as to future surgery and loss of wages as well as the claim of neck injury and a resulting three-month period of disability as unconvincing. The trial judge concluded that "full valuation for plaintiff's injury could be found in a verdict range from $15,000.00 to $20,000.00; that any valuation substantially in excess of $20,000.00 would be excessive and in itself indicative of passion and prejudice in favor of

an injured workman and against a target defendant. Taken in conjunction with the obvious failure of the jury to reduce its award because of the plaintiff's own negligence and its contribution to the injury, the verdict of $60,500 is patently excessive and can only be explained as having been given under the influence of passion and prejudice.''

The FELA provides that defense of contributory negligence is not available to an employer to defeat an employee's claim for injury, but only to diminish the amount of damages in proportion to the amount of negligence attributable to the employee (45 U.S.C.A., § 53). The burden of proving contributory negligence is on the defendant. (*Central Vermont R. Co.* v. *White,* 238 U.S. 507 [59 L.Ed. 1433, 35 S.Ct. 865].)

 Treating contributory negligence independently of the assumption of risk aspect, we interpret the jury's award, large though it was, as an implied determination that there was no contributory negligence on plaintiff's part. We find that there was sufficient evidence to support that determination (see *Lavender* v. *Kurn,* 327 U.S. 645 [90 L.Ed. 916, 66 S.Ct. 740]); and that there was no substantial showing that plaintiff had violated any safety regulation.

 We are sensitive that the limited role of the appellate court in reviewing an order granting a new trial is to determine whether the trial judge exercised sound discretion in his evaluation of the evidence. On the issue of plaintiff's contributory negligence, we conclude that the court abused its discretion when it determined that there was substantial evidence that negligence on plaintiff's part contributed to his injury in the percentile expressed in the court's specification of reasons, or in any lesser percentile or degree. Accordingly, we held that it was error to grant a new trial on the issue of negligence.

Moreover, defendant is in no position of strength to argue that its negligence was minimal. The defense offered no evidence of its own as to causation of the accident. It did not present the fellow worker, Jones, nor the foreman, Smitty, nor the crane operator, nor did it account for their unavailability as witnesses. It did not produce any records from its company hospital except such as plaintiff put in evidence, nor the testimony of the doctors who examined and treated plaintiff there. It did not produce for observation or experimentation the two types of cable hooks to refute plaintiff's claim that they were different and that the new type was difficult to insert in the

hole in the cover pan. The jury was entitled to conclude that defendant had no additional evidence to rebut plaintiff's prima facie case of negligence on defendant's part. We are not impressed by the argument in defendant's brief that inherent conflicts in plaintiff's evidence overcame any need for presenting defensive evidence.

". . . [I]t is well established that the employee need not prove that the negligence of the employer or its servants was the sole proximate cause of the injury, the railroad being liable for an injury to an employee although its negligence is only a contributing proximate cause." (*Lewis* v. *Union Pac. R.R. Co.*, 127 Cal.App.2d 280, 284 [273 P.2d 706]; see *Grand Trunk W.R. Co.* v. *Lindsay*, 233 U.S. 42 [58 L.Ed. 838, 34 S.Ct. 581].)

The remaining ground on which the trial court's order rests is that the award of $60,500 damages was excessive. It appears from the record that all of plaintiff's medical and hospital expenses incident to the accident were assumed by the defendant employer. It further appears that plaintiff will suffer special damages for medical and hospital services and loss of wages in an estimated sum of $5,000 only if and when he submits to the experimental and corrective arm and spinal surgery. Plaintiff's medical expert, the neurological surgeon, opined that such surgery might relieve some of plaintiff's discomfort and physical impairments but his prognosis was very guarded, and plaintiff himself was not at all certain that he would submit to such surgery. The record further shows that in the aggregate plaintiff lost approximately seven months from his work. Taking the average of his successive hourly rates of pay for a 40-hour work week, this would result in lost wages of approximately $3,150 to which may be added overtime service of 48 hours a month at the premium rate in a total estimated amount of $2,500. Thus, plaintiff's combined past and future special damages may range from $5,650 to $10,650. When deducted from the total award of $60,500 this leaves a sum between $54,850 and $49,850 to be classified as general damages. At the time of trial plaintiff was 60 years of age (born May 17, 1906) and had a life expectancy of 15.8 years, although it may be assumed that he would have to retire from his railroad employment at age 65.

After giving due consideration to all these factors, we conclude that the trial judge in the exercise of judicial discretion properly held that the award of $60,500 was contrary to the weight of the evidence and was excessive. Accordingly, the

order granting a new trial on that ground must be affirmed. (See *Smith* v. *Union Oil Co.*, 241 Cal.App.2d 338, 346-348 [50 Cal.Rptr. 499], regarding the ''weight of the evidence'' test in considering motions for new trials.)

The issue of damages in FELA cases frequently requires that the trier of fact consider the plaintiff's negligence in diminution of the award. However, since we have concluded that the jury disposed of the issue of plaintiff's negligence adverse to defendant, we perceive no need to retry that issue.

The order granting a new trial is modified to limit the new trial to the issue of damages only. As so modified it is affirmed.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied April 23, 1968, and respondent's petition for a hearing by the Supreme Court was denied June 26, 1968.